# 19-267 (L)
# 19-275 (con.)

## United States Court of Appeals
## for the Second Circuit

STATE OF NEW YORK, STATE OF CONNECTICUT, STATE OF
NEW JERSEY, STATE OF WASHINGTON, COMMONWEALTH OF
MASSACHUSETTS, COMMONWEALTH OF VIRGINIA, STATE OF
RHODE ISLAND, CITY OF NEW YORK,

*Plaintiffs-Appellees,*

*against*

UNITED STATES DEPARTMENT OF JUSTICE,
WILLIAM P. BARR, in his official capacity as Attorney
General of the United States,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR CITY OF NEW YORK

RICHARD DEARING
DEVIN SLACK
JAMISON DAVIES
*of Counsel*

April 17, 2019

ZACHARY W. CARTER
*Corporation Counsel*
*of the City of New York*
100 Church Street
New York, New York 10007
212-356-2490 or -2500
jdavies@law.nyc.gov

Reproduced on Recycled Paper

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iv

PRELIMINARY STATEMENT ................................................................ 1

ISSUES PRESENTED FOR REVIEW ........................................................ 2

STATEMENT OF THE CASE ................................................................. 2

    A.  The Byrne JAG program and Congress's goal to empower
         state and local governments to choose and achieve their
         own criminal-justice priorities ..................................................... 2

    B.  The DOJ's break with the congressional design, and its
         own past practice, by adding immigration-related
         conditions to the Byrne JAG program ........................................ 5

    C.  The City's policies and practices safeguarding sensitive
         information and encouraging all residents to participate
         in public life ............................................................................... 9

    D.  The district court's decision, the latest in a long line
         striking down the conditions ..................................................... 12

SUMMARY OF ARGUMENT ................................................................ 15

ARGUMENT

POINT I

    BY GRAFTING NEW CONDITIONS ONTO BYRNE JAG
    FUNDING, THE DOJ HAS RUN ROUGHSHOD OVER THE
    CONSTITUTION AND CONSTRAINTS ON AGENCY
    ACTION ....................................................................................... 18

i

# TABLE OF CONTENTS (cont'd)

Page

A. The DOJ acted ultra vires, usurped Congress's spending power, and overrode the legislative design for the Byrne JAG program by imposing conditions without statutory authorization.................................................................18

   1. The congressional design carefully limits the DOJ's authority to withhold funds, in keeping with its greater purpose of promoting state and local flexibility. ..................20

   2. Section 10102(a)(6) does not confer any new powers on the DOJ at all, much less the sweeping power it claims here. ......................................................................23

   3. Section 10353(a)(5)(D) does not authorize the § 1373 condition, and the DOJ concedes it does not support the notice and access conditions. ...........................................30

B. In any event, it was arbitrary and capricious for the DOJ to dramatically change its approach to Byrne JAG funding with no meaningful analysis.......................................39

POINT II

SECTION 1373 CONTRAVENES THE CONSTITUTION IN MULTIPLE WAYS..........................................................................43

A. The statute impermissibly issues a direct order to state and local governments about the laws and policies they can and cannot adopt...............................................................45

B. The statute's sever-and-enlist gambit negates a core feature of sovereignty by breaking local control over local officials. ......................................................................48

CONCLUSION ......................................................................55

## TABLE OF CONTENTS (cont'd)

**Page**

CERTIFICATE OF COMPLIANCE .........................................................56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Dole*,
  927 F.2d 771 (4th Cir. 1991) ............................................................... 25

*Am. Surety Co. of New York v. Marotta*,
  287 U.S. 513 (1933) ................................................................... 25, 52

*Bennett v. Ky. Dep't of Educ.*,
  470 U.S. 656 (1985) ........................................................................ 37

*Bloate v. United States*,
  559 U.S. 196 (2010) ........................................................................ 26

*Bond v. United States*,
  564 U.S. 211 (2011) ........................................................................ 44

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012) ........................................................................ 26

*City & Cnty. of San Francisco v. Sessions*,
  349 F. Supp. 3d 924 (N.D. Cal. 2018) ........................................... 32, 44

*City & Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) .................................................... 6, 7, 19

*City of Chicago v. Sessions*,
  321 F. Supp. 3d 855 (N.D. Ill. 2018) ................................. 44, 47, 50, 52

*City of Chicago v. Sessions*,
  888 F.3d 272 (7th Cir. 2018), *vacated in part on other
  grounds* 2018 U.S. App. LEXIS 21801 (Aug. 10, 2018) ............. *passim*

*City of New York v. United States*,
  179 F.3d 29 (2d Cir. 1999) ...................................................... 46, 47, 54

*City of Philadelphia v. Attorney General of the United States*,
  916 F.3d 276 (3d Cir. 2019) ...................................................... *passim*

iv

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*City of Philadelphia v. Sessions,*
280 F. Supp. 3d 579 (E.D. Pa. 2017)...................................................29

*City of Philadelphia v. Sessions,*
309 F. Supp. 3d 289 (E.D. Pa. 2018)...................................................44

*Dalton v. Specter,*
511 U.S. 462 (1994)...................................................19

*Davis v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999)...................................................37

*Duncan v. Walker,*
533 U.S. 167 (2001)...................................................35

*FCC v. Fox TV Stations, Inc.,*
556 U.S. 502 (2009)...................................................41

*Fed. Land Bank v. Bismarck Lumber Co.,*
314 U.S. 95 (1941)...................................................25

*La. Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986)...................................................19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983)...................................................40, 41

*Murphy v. NCAA,*
138 S. Ct. 1461 (2018)............................................. *passim*

*New York v. United States,*
505 U.S. 144 (1992)...................................................45, 48, 50

*New York v. United States Dep't of Justice,*
343 F. Supp. 3d 213 (S.D.N.Y. 2018)...................................................47

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n,*
  499 U.S. 117 (1991)................................................................35

*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981)..................................................................37

*Printz v. United States,*
  521 U.S. 898 (1997).......................................... 43, 48, 50, 52

*Rapanos v. United States,*
  547 U.S. 715 (2006)..............................................................30

*Reno v. Condon,*
  528 U.S. 141 (2000)..............................................................53

*South Dakota v. Dole,*
  483 U.S. 203 (1987)..............................................................19

*United States v. California,*
  314 F. Supp. 3d 1077 (E.D. Cal. 2018) ...........................44, 47

*Util. Air Regulatory Grp. v. EPA,*
  573 U.S. 302 (2014)..............................................................27

## Constitution

U.S. Const. art. I...................................................................18

U.S. Const. art. II..................................................................19

U.S. Const. amend X ..................................................... *passim*

## Statutes

5 U.S.C. § 706(2)...................................................................39

8 U.S.C. § 1373 ............................................................. *passim*

13 U.S.C. § 9(a)....................................................................54

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

26 U.S.C. § 432(e) .................................................................. 38

26 U.S.C. § 6103 .................................................................... 54

31 U.S.C. § 1352 .................................................................... 32

34 U.S.C. § 10102 .......................................................... *passim*

34 U.S.C. § 10152(a) .......................................... 3, 22, 40, 42

34 U.S.C. § 10153(a) ...................................................... *passim*

34 U.S.C. § 10156(a) ............................................................ 4, 20

34 U.S.C. § 10156(b) ................................................................ 4

34 U.S.C. § 10156(d) ................................................................ 4

34 U.S.C. § 10228(a) .......................................... 3, 22, 35, 36

34 U.S.C. § 10446(e) .............................................................. 28

34 U.S.C. § 40914(b) .............................................................. 21

34 U.S.C. § 60105(c) .............................................................. 21

42 U.S.C. § 300v-1(b) ............................................................ 30

42 U.S.C. § 2000d .................................................................. 32

42 U.S.C. § 10305(a) .............................................................. 28

42 U.S.C. § 16154(g) .............................................................. 38

47 U.S.C. § 531(d) .................................................................. 33

Omnibus Crime Control and Safe Streets Act, Pub. L. No.
  90-351, 82 Stat. 197 (1968) ................................................ 2

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Justice System Improvement Act of 1979, Pub. L. No. 96-157, 93 Stat. 1167 (1979) ....................................................... 34

Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006) .................................................................. 28

Water Resources Reform and Development Act of 2014, Pub. L. No. 113-121,128 Stat. 1193 (2014) ................................. 38

**Legislative Materials**

Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016) ...................................................................... 23

Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016) ................................................................................. 23

Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2015) ...................................................................... 23

Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. (2015) ...................................................................... 23

Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015) ............................................................ 23

Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015) ......................... 23

Protecting American Lives Act, S. 1842, 114th Cong. (2015) ............... 23

H.R. Rep. No. 109-233 (2005) ............................................................ 3, 22

S. Rep. No. 90-1097 (1968) ..................................................................... 36

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Controlling Crime Through More Effective Law Enforcement:*
  *Hearings Before the Subcomm. on Criminal Laws and*
  *Procedure of the S. Comm. on the Judiciary*, 90th Cong.
  (1967)........................................................................................... 36

**Other Authorities**

2 C.F.R. § 200.205(b) .................................................................... 29

2 C.F.R. § 200.210(b) .................................................................... 30

28 C.F.R. § 66.12 (2006) ............................................................... 29

Exec. Order 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) ............... 6

N.Y.C. Admin. Code § 23-1201 *et seq.* ......................................... 10

N.Y.C. Charter § 8(g) ............................................................... 9, 51

2017 N.Y.C. Local Law 245 ........................................................... 10

2017 N.Y.C. Local Law 247 ........................................................... 10

Mayoral Exec. Order No. 34 (May 13, 2003) ................................. 9

Mayoral Exec. Order No. 41 (Sept. 17, 2003) ......................... 9, 10

Federalist No. 39 ........................................................................... 43

Federalist No. 58 ........................................................................... 18

Dep't of Justice, *DOJ Releases FY17 JAG Funding*
  (June 27, 2018)............................................................................ 8

Donald J. Trump, *Donald Trump's Contract with the*
  *American Voter* (Oct. 22, 2016).................................................. 5

## PRELIMINARY STATEMENT

With the Trump administration's prior efforts to conscript state and local governments in federal immigration enforcement struck down, the Department of Justice tried a new tack: it took a non-discretionary grant program meant to help states and cities pursue their own criminal-justice priorities—the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program—and held a quarter of a billion dollars hostage until they "agreed" to aid federal immigration priorities. Joining a chorus of courts, the United States District Court for the Southern District of New York (Ramos, J.) found that this new approach was no more lawful than the old one, for multiple reasons.

This Court should affirm. Few responsibilities of the Judiciary are more important than safeguarding the separation of powers between the branches of the federal government and the division of powers between the federal government and the states and their political subdivisions. That responsibility is central here: the DOJ's proposed conditions on Byrne JAG grants reflect a disturbing disregard for bedrock constitutional principles and limits on Executive authority.

## ISSUES PRESENTED FOR REVIEW

1.   Did the district court correctly conclude that in grafting extra-statutory, substantive conditions onto the non-discretionary Byrne JAG program, the DOJ acted ultra vires, intruded on the spending power, and acted arbitrarily and capriciously?

2.   Did the district court correctly conclude that one of the statutes that the DOJ relies on—8 U.S.C. § 1373—itself violates the Tenth Amendment by issuing direct orders to states and their political subdivisions and severing their control over their own officials?

## STATEMENT OF THE CASE

### A.  The Byrne JAG program and Congress's goal to empower state and local governments to choose and achieve their own criminal-justice priorities

Congress began appropriating funds for grants to state and local law enforcement and criminal-justice systems in 1968, with the Omnibus Crime Control and Safe Streets Act. Pub. L. No. 90-351, 82 Stat. 197 (1968). Recognizing that "crime is essentially a local problem that must be dealt with by State and local governments," Congress aimed to "assist State and local governments in strengthening and improving law enforcement at every level by national assistance." 82 Stat. at 197–98. And to guard against the federalization of policy,

2

Congress barred "any [federal] department, agency, officer, or employee" from exercising "any direction, supervision, or control" over state and local law enforcement agencies. *Id.* at 208. While much has changed over five decades, that prohibition has not, and remains in effect today. 34 U.S.C. § 10228(a).

The Byrne JAG program—named after an NYPD officer killed in the line of duty—entered the scene in 2006. *See id.* §§ 10151–58. As with its predecessor, Congress put local autonomy front and center, affording grant recipients the "flexibility to spend money for programs that work for them" rather than "impos[ing] a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). Grant recipients may put funds toward one or more of eight enumerated areas: from crime prevention and education to drug treatment to mental health treatment. 34 U.S.C. § 10152(a)(1)(A)–(H). Immigration enforcement is not among them.

Drawing a sharp contrast with discretionary grant programs, which ordinarily give an agency freedom to choose who gets funds and when, Congress carefully defined who is entitled to Byrne JAG funds, how awards are to be calculated, and the narrow circumstances under which funds can be withheld. The DOJ, the administering agency, must

3

issue grants in "accordance with the formula," *id.* § 10152(a)(1), which allocates 60% of funds to states and 40% to local governments, *id.* § 10156(b), and calculates the distribution of awards based on relative population and crime rates, *id.* § 10156(a)(1), (d)(2)(A). When Congress wanted to deviate from that formula, it said so: for example, it specified that each state must receive at least 0.25% of all appropriated funds no matter what. *Id.* § 10156(a)(2).

To receive Byrne JAG funds, a state or local government must submit an "application to the Attorney General." *Id.* § 10153(a). The statute requires the applicant to make specific certifications. For example, an applicant must certify that the federal funds will build on, rather than supplant, state and local funds, *id.* § 10153(a)(1), and that the applicant made its application public and sought comment, *id.* § 10153(a)(3). Most relevant here, the applicant must certify that it "will comply with all provisions of this part and all other applicable Federal laws." *Id.* § 10153(a)(5)(D).

The City of New York has applied for and received Byrne JAG funds every year since 2005 (Joint Appendix ("A") 101). It is a significant funding source; in 2016, for instance, the City received

4

nearly $4.3 million (A158). And the City has put those funds to good use, funding a variety of local criminal-justice programs, from paying 911 emergency responders, to financing diversion programs for nonviolent felony drug offenders, to supporting interventions for people with mental and behavioral needs, to upgrading criminal-justice data collection systems, to funding school safety initiatives (A101).

### B. The DOJ's break with the congressional design, and its own past practice, by adding immigration-related conditions to the Byrne JAG program

For more than a decade, the Byrne JAG program worked, and worked well, enabling state and local governments to pursue and achieve criminal-justice goals of their own choosing. But beginning on the 2016 campaign trail, this administration has singled out the country's safest and most diverse cities with an eye toward jettisoning policies that foster trust between immigrant communities, on one hand, and law enforcement officials, public health officials, and other

government actors, on the other. From the stump, then-candidate Trump promised to "cancel all federal funding to sanctuary cities."[1]

Time has shown that the administration intends to deliver on that promise even if means trampling the Constitution. Shortly after taking the oath of office, President Trump issued an executive order purporting to proclaim that so-called sanctuary jurisdictions that refused to comply with 8 U.S.C. § 1373—which prohibits state and local governments from "in any way" restricting their officials from communicating with federal immigration authorities about the "citizenship or immigration status, lawful or unlawful, of any individual"—"are not eligible to receive Federal grants." Exec. Order 13,768, 82 Fed. Reg. 8799, 8801 (Jan. 25, 2017). The measure was held unconstitutional, because the administration "claimed for itself Congress's exclusive spending power," making no showing that that "Congress authorized it to withdraw federal grant moneys from jurisdictions that do not agree with [its] immigration strategies." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018).

---

[1] Donald J. Trump, *Donald Trump's Contract with the American Voter* (Oct. 22, 2016), at 1, https://perma.cc/9GYA-59B5.

Undeterred, the administration plowed ahead. Suddenly, the DOJ announced that, beginning in fiscal year 2017, it would impose three new substantive conditions on all Byrne JAG grantees.

- The first—the access condition—would compel state and local governments to adopt a law, policy, or the like to "ensure that agents of the United States" have access to every state and local "correctional facility," to "meet with individuals who are (or are believed by such agents to be) aliens" (A292).

- The second—the notice condition—would compel a law or policy guaranteeing prompt compliance with any "formal written request" for "advance notice of the scheduled release date and time for a particular alien" made by Immigration and Customs Enforcement (ICE) or its parent department (*id.*).

- The third—the § 1373 condition—would compel a series of ongoing certifications about compliance with 8 U.S.C. § 1373, including by the chief executive and chief legal officer of a municipality, on pain of "criminal prosecution" (A264, 266–67).[2]

---

[2] The Office of Justice Programs had previously, in 2016, declared that 8 U.S.C. § 1373 had a relationship to the Byrne JAG statute, but its declaration did not

*(cont'd on next page)*

To announce the new conditions, the DOJ issued a press release and a one-page "Backgrounder" (S.D.N.Y. ECF No. 33, Ex. 17, at AR-992–93). Neither explained why the DOJ decided to impose the conditions, how the conditions would advance the congressional design behind the Byrne JAG program, or what alternatives had been considered (*id.*).

In October 2017, the DOJ made a "preliminary" determination that the City had "laws, policies, or practices" that did not comply with § 1373 (S.D.N.Y. ECF No. 41, Ex. B). Later, the DOJ distributed the bulk of Byrne JAG funds to jurisdictions that it had vetted and deemed sufficiently committed to "keeping criminal aliens off our streets and our law abiding citizens safe."[3] The City ultimately received its fiscal year 2017 award through a separate litigation that it was not directly involved in (*see* A8 n.6), but the DOJ reserved its right to claw back the money based on the outcome of this case.

---

impact fiscal year 2016 funding and grantees were not required to submit "additional certifications specific to 8 U.S.C. § 1373" (A182–83).

[3] Dep't of Justice, *DOJ Releases FY17 JAG Funding* (June 27, 2018), https://perma.cc/Y8G3-A8N4.

## C. The City's policies and practices safeguarding sensitive information and encouraging all residents to participate in public life

The DOJ has never provided a cogent explanation as to why it has denied Byrne JAG funds to the City, but its dissatisfaction is clearly directed at the City's policies concerning the treatment of sensitive information obtained from the public. The City's current approach stems from voters' approval of a revision to the City Charter reaffirming that "[t]he city has the power to determine the duties of its employees" and emphasizing that it is "essential to the workings of city government that the city retain control over information obtained by city employees in the course of their duties." N.Y.C. Charter § 8(g).

In 2003, the City implemented the will of the voters and issued a general confidentiality policy, adopted through mayoral orders and aimed at limiting the disclosure of personal information and encouraging crime victims and witnesses to come forward and cooperate with authorities. *See* Mayoral Exec. Order No. 41 (Sept. 17, 2003), *available at* https://perma.cc/Y85B-3QEY; Mayoral Exec. Order No. 34 (May 13, 2003), *available at* https://perma.cc/S66U-JBVR. This is a general policy: it covers an array of information beyond immigration

9

status, including sexual orientation, receipt of public assistance, and status as a victim of domestic violence or sexual assault; and it prohibits disclosure broadly, not just to immigration authorities. *See* Mayoral Exec. Order No. 14 §§ 1–2. In fact, exceptions allow certain local officers to "cooperate with federal authorities in investigating and apprehending aliens suspected of criminal activity." *Id.* § 4(b).

Building on these mayoral orders, in 2017 the City Council enacted local laws regulating the collection, maintenance, and disclosure of a wide variety of personally identifying information. 2017 N.Y.C. Local Law 245; 2017 N.Y.C. Local Law 247, *codified at* N.Y.C. Admin. Code §§ 23-1201–23-1205. The law is uniform not only in that it applies to all City agencies and all City employees, and protects everyone whose information the City may come to possess, but also in that it applies to all manner of information, from "employment status" to "license plate number" to "information concerning social media accounts," not just immigration status. N.Y.C. Admin. Code § 23-1201. The law creates a sweeping presumption of non-disclosure, and then regulates when information may be disclosed. *Id.* § 23-1201(c).

10

Together, the mayoral orders and local laws provide City employees with consistent, clear guidance about how they can obtain, use, and disclose personal information as public servants. The City's policies encourage all residents to trust in local government and local law enforcement, predicated on the understanding that the City benefits when all individuals—regardless of personal attributes—feel safe reporting crimes; cooperating with police investigations; sending their children to school; accessing emergency medical treatment, prenatal care and other public health programs; and participating in public life generally (A108–09).

The benefits of residents' engagement with City officials are not just theoretical. By maintaining good police–community relations, law enforcement solves crime more effectively and keeps residents safer; in many cases undocumented immigrants will not report crimes or cooperate with the police if their information is not protected by the City. Community cooperation is also vital to the City's public health; if people fear their personal information will be disclosed, they may also refrain from seeking out essential services such as immunizations, and treatment for HIV and tuberculosis (*see* S.D.N.Y. ECF No. 38).

11

While these safeguards are vital, the City also recognizes the importance of working with federal immigration authorities where the City has made a considered judgment that cooperation protects public safety. The City responds to ICE requests accompanied by a judicial warrant to maintain custody of a person whom the City considers to be a public safety risk beyond the time the person would otherwise be released, so that ICE can assume custody (A112). The City similarly cooperates with requests accompanied by an administrative warrant for notification of release information for individuals in the City's custody who have been convicted of a violent or serious crime or are identified as a possible match in the terrorist screening database (*id.*). And the City allows ICE to interview inmates in its custody who provide voluntary written consent (A113).

### D. The district court's decision, the latest in a long line striking down the conditions

Like many jurisdictions across the country, the City and a group of seven states brought these actions challenging the DOJ's conditions on Byrne JAG funding as violating the Constitution—both the separation of powers and the Tenth Amendment—and the

12

Administrative Procedure Act (A51, 95). The City also sought a declaration that 8 U.S.C. § 1373 itself is unconstitutional or, in the alternative, that the City complies with it insofar as it can be constitutionally applied (A131–32).

On the parties' cross-motions, the United States District Court for the Southern District of New York (Ramos, J.) granted summary judgment to the City and states regarding fiscal year 2017 Byrne JAG awards (fiscal year 2018 is the subject of ongoing proceedings below). The court permanently enjoined the DOJ from enforcing the conditions in connection with those awards (A42–43, 45–46).

The district court began its analysis by finding that the conditions violated the separation of powers by intruding on Congress's spending power—or, viewed from a different angle, were imposed without statutory authority and therefore ultra vires (A30, 42). The court rejected the DOJ's claim that authority to impose the conditions could be found outside of the Byrne JAG statute in 34 U.S.C. § 10102(a)(6), noting that the provision—which states only that the Assistant Attorney General shall "exercise such other powers and functions as may be vested in [him] pursuant to this chapter or by delegation of the

Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants"—does not create any new powers at all; "rather, such authority must come from elsewhere in the chapter or have been delegated by the Attorney General" (A14). And the § 1373 condition, the court concluded, could not be imposed by virtue of 34 U.S.C. § 10153(a)(5)(D)—a provision within the Byrne JAG statute that requires grantees to certify that they "will comply with all provisions of this part and all other applicable Federal laws"—because that language refers to "federal laws applicable to the grant," not all of the innumerable federal laws that could theoretically apply to a state or local government, like § 1373 (A19).

As an alternative ground for annulling the conditions, the district court held that imposing the conditions was arbitrary and capricious (A36). Highlighting the lack of justification in the administrative record, the court noted that the DOJ neither considered "the negative impacts that may result from imposing the conditions" nor analyzed whether "the perceived benefits outweigh these drawbacks" (A34–35).

Moving beyond the conditions, the district court held that § 1373 itself runs afoul of the Tenth Amendment by dictating to state and local

14

governments what they may and may not do, making it more difficult for citizens to distinguish between federal, state, and local policy, and shifting a portion of immigration-enforcement costs to states and cities (A24–26). The court rejected the notion—pressed by the DOJ—that § 1373 is nothing more than a "preemption provision" or a purely ministerial "information-sharing provision" (A26–28).

## SUMMARY OF ARGUMENT

To begin, the DOJ lacks the requisite statutory authority to impose any of the sweeping and intrusive conditions. Byrne JAG is a non-discretionary, formula grant program enacted by Congress to provide maximum flexibility to state and local authorities in improving their criminal-justice systems. As the DOJ concedes, nothing in any statute directly authorizes it to impose any of the challenged conditions. Instead, it relies on two inapplicable provisions that come nowhere near conveying the authority it claims.

First, the DOJ contends that it may impose the challenged conditions under a provision of the statute permitting the Assistant Attorney General to "exercise such other powers and functions as may be vested in the Assistant Attorney General … or by delegation of the

Attorney General, including placing special conditions on all grants."
34 U.S.C. § 10102(a)(6). But that statute only permits the Assistant
Attorney General to exercise powers that are vested in him by some
other source. The DOJ does not, and cannot, identify any such source,
and instead argues that the "including" clause grants the Assistant
Attorney General freestanding authority to impose whatever conditions
he sees fit. That reading is contrary to both basic principles of statutory
construction and the statute's structure and purpose. None of the
conditions are permitted under the statute.

Next, the DOJ contends that 8 U.S.C. § 1373 is an "applicable
Federal law" under the Byrne JAG statute, 34 U.S.C. § 10153(a)(5)(D),
and that it is therefore authorized to impose the § 1373 condition. But,
fairly read, that provision requires compliance with federal laws that
apply to grantees in their capacity as grantees and, therefore, means
that applicants are required to certify compliance with laws germane to
the grant. The provision cannot reasonably be construed as a
requirement that applicants certify compliance with every subtitle,
chapter, and subchapter of every title of the United States Code on pain
of losing vital criminal-justice funding. The statutory structure confirms

16

this reading, as it sets out specific reductions for noncompliance with specific laws—reductions that would be unnecessary if the DOJ had independent authority to deny funds for violations of any federal law.

Because it seeks to use the power of the purse as a stick to force the City to adopt its preferred policies, the DOJ's imposition of the challenged conditions also violates the separation of powers. Congress delineated how Byrne JAG funds are to be awarded according to a detailed statutory formula. The DOJ's attempt to usurp Congress's prerogative to appropriate funds violates the Constitution.

Beyond the lack of statutory authority and concomitant separation-of-powers violation, the DOJ also acted arbitrarily and capriciously in adopting the conditions. It failed to consider the well-documented downsides to implementing these conditions, including a collapse in the hard-won trust of immigrant communities in local law enforcement. The failure to consider the costs of a proposed policy change is a textbook example of arbitrary and capricious agency action.

The § 1373 condition fails for another independent reason: § 1373 is unconstitutional. The statute impermissibly prohibits the City from enacting any "local law" that would restrict "any government entity or

17

official" from sharing information with federal immigration authorities. As recently confirmed by the Supreme Court in *Murphy v. NCAA*, statutes that purport to restrict states and localities from enacting certain policies violate the sovereignty reserved to them by the Tenth Amendment. 138 S. Ct. 1461, 1478 (2018).

## ARGUMENT

### POINT I

### BY GRAFTING NEW CONDITIONS ONTO BYRNE JAG FUNDING, THE DOJ HAS RUN ROUGHSHOD OVER THE CONSTITUTION AND CONSTRAINTS ON AGENCY ACTION

**A. The DOJ acted ultra vires, usurped Congress's spending power, and overrode the legislative design for the Byrne JAG program by imposing conditions without statutory authorization.**

The spending power belongs to Congress alone. U.S. Const. art. I, § 8, cl. 1 & § 9, cl. 7. Hamilton called the power of the purse "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people," Federalist No. 58, because with it comes the ability to "attach conditions on the receipt of federal

18

funds … to further broad federal policy objectives," *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (cleaned up).[4]

The Executive, in contrast, must "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and can neither refuse to spend appropriated funds nor decline to follow the scheme attached to those funds simply due to policy disagreements. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018). Without authorization from Congress, an executive agency "literally has no power to act." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also City of Philadelphia v. Attorney General of the United States*, 916 F.3d 276, 284 (3d Cir. 2019) (noting that executive agency that acts without statutory authority may also violate separation of powers).[5]

---

[4] This brief uses "(cleaned up)" to indicate that internal quotation marks, alterations, and citations have been omitted from quotations.

[5] The DOJ quibbles that not every action "'in excess of [its] statutory authority is *ipso facto* in violation of the Constitution'" (Brief for Appellants ("App. Br.") 37) (quoting *Dalton v. Specter*, 511 U.S. 462, 472 (1994)). True, but the DOJ never explains how that caveat applies to *this* action. The only case it cites—*Dalton*— stands for the non-controversial proposition that "adjudging … compliance" with a statute will not always implicate the separation of powers. *Dalton*, 511 U.S. at 468, 471–72 (cleaned up). The question here, in contrast, is not only whether the DOJ has complied with the Byrne JAG statute, but also whether it has usurped the power of the purse to impose extra-statutory conditions on grants to push jurisdictions to advance its own goals, not those of Congress. *See City of Philadelphia*, 916 F.3d at 284.

19

Like the courts before it, the district court correctly held that there is no statutory authorization for the DOJ to impose its novel conditions on Byrne JAG funding: not in the Byrne JAG statute and not anywhere else in the United States Code. The DOJ's strained, post hoc attempts to find a home for its unheralded authority should be rejected.

### 1. The congressional design carefully limits the DOJ's authority to withhold funds, in keeping with its greater purpose of promoting state and local flexibility.

The DOJ can point to nothing that comes close to authorizing the expansive power it professes to hold. At the outset, the DOJ's conditions are simply at odds with the structure and essential nature of the Byrne JAG program. Congress crafted a formula-based grant program, distributing awards through a "carefully defined calculation" considering only population and crime statistics. *City of Chicago v. Sessions*, 888 F.3d 272, 285 (7th Cir. 2018), *vacated in part on other grounds* 2018 U.S. App. LEXIS 21801 (Aug. 10, 2018); *see also* 34 U.S.C. § 10156(a)(1) (mandating that "the Attorney General *shall* ... allocate" funds based on the statutory formula) (emphasis added).

When Congress authorized the DOJ to withhold funds to advance policy goals, it said so explicitly, defining with great care the kind of compliance failures that can trigger the withholding of funds and, in each instance, placing strict limits on the amounts that can be withheld. Congress declared that no more than 10% of funds may be withheld for failure to comply with "death-in-custody" reporting requirements, 34 U.S.C. § 60105(c)(2), and that 4% of funds may be withheld for failing to meet criminal background check requirements, rising to a 5% mandatory reduction for egregious violations, 34 U.S.C. § 40914(b)(1)–(2). It also required a 10% reduction for failure to comply with sex offender registration requirements, *id.* § 20927(a), and a 5% reduction for failure to comply with measures to eliminate prison rape, *id.* § 30307(e)(2).

Reinforcing how little discretion the DOJ has, Congress allowed it to reserve no more than 5% of Byrne JAG funds for discretionary grants (and even then only under limited circumstances). *Id.* § 10157(b). As the Third Circuit recognized, "[i]f Congress had already given the Attorney General … sweeping authority to withhold all funds for any reason, it would have no need to delineate numerous, specific circumstances

21

under which the Attorney General may withhold limited amounts of funds." *City of Philadelphia*, 916 F.3d at 286. That's exactly right; everything—the statute's text, structure, and purpose—makes clear that the DOJ has no power to invent conditions to advance its own policy goals, transforming the program from a formula-based regime to a discretionary one, prioritizing federal priorities over state and local ones, and casting aside Congress's carefully calibrated scheme.

After all, the entire point of the program is to enhance state and local—not federal—control by giving state and local governments "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). At every turn, Congress empowered state and local governments to pursue their own criminal-justice priorities, so long as grant funds are used in at least one of eight enumerated program areas—none of which is immigration. 34 U.S.C. § 10152(a)(1)(A)–(H). Congress protected that flexibility by prohibiting federal supervision of state and local law enforcement, *see id.* § 10228(a), and confining the DOJ to the narrowest band of discretion when administrating the grant program.

Driving the point home, Congress has *repeatedly* rejected proposals to condition federal funding on acquiescence to immigration-related requirements like those imposed here—including a proposal by then-Senator Sessions, who, as Attorney General, would later declare that this power had existed all along.[6] The authority claimed by the DOJ here is fundamentally incompatible with the congressional design.

### 2. Section 10102(a)(6) does not confer any new powers on the DOJ at all, much less the sweeping power it claims here.

Turning to the DOJ's claimed sources of authority, the DOJ first argues that all three of the challenged conditions are authorized by 34 U.S.C. § 10102, which is not part of the Byrne JAG statute, but rather sets forth the duties and functions of the Assistant Attorney General for the Office of Justice Programs (the "AAG"). In particular, the DOJ relies on paragraph (a)(6), which states that the AAG shall "exercise such

---

[6] *See*, *e.g.*, Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. § 4 (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. § 4 (2016); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3 (2015); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. § 2 (2015); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. § 3(a) (2015); Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2 (2015); Protecting American Lives Act, S. 1842, 114th Cong. § 3(d) (2015).

other powers and functions as may be vested in the [AAG] pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). As the district court held, this provision hardly delegates the staggering power the DOJ claims: the ability to impose substantive conditions on all federal grants overseen by the DOJ—including $2 billion in formula-based grants—even if they are unrelated to a grant program and even without a separate authorization to impose any conditions at all (A13–15).

The DOJ's argument is premised on a radical misreading of § 10102, which is just a "who" statute identifying the government official responsible for exercising certain duties. It collates a variety of duties and obligations and makes clear that they are the responsibility of the AAG, rather than some other DOJ employee. The nature of § 10102 refutes any claim that Congress chose it to vest the AAG with wide-ranging and discretionary authority over all DOJ grants.

The plain meaning of the statutory language confirms this. The statute provides that the AAG may place special conditions on grants to the extent authorized by Congress or delegated by the Attorney

24

General. *See City of Chicago*, 888 F.3d at 284–85. The "including" clause signifies that the authority to impose special conditions on grants is a "subcategory of the types of powers and functions that the Assistant Attorney General may exercise when vested in the Assistant Attorney General either by the terms of this chapter or by delegation of the Attorney General." *Id.* at 285; *see also City of Philadelphia*, 916 F.3d at 287–88. It is an illustration of the kind of power that could be "vested" in or "delegat[ed]" to the AAG, not an independent grant of authority. *See Fed. Land Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (explaining that the term "including … connotes simply an illustrative application of the general principle").[7]

The fact that the "including" clause is illustrative does not render it superfluous or insignificant, as the DOJ argues (App. Br. 23–24). The

---

[7] The DOJ cites two cases for the proposition that the word "including" can sometimes be read to mean "and" (App. Br. 23), but it does not explain why that is the best reading of "including" as used in § 10102(a)(6). The first cited case stands only for the unremarkable proposition that the word "include" is best interpreted to mean "including, but not limited to," and is consistent with the cases explaining that "including" is used to denote illustrative examples. *See Am. Surety Co. of New York v. Marotta*, 287 U.S. 513, 517 (1933). And, in the second case, the court noted at the outset that "the term 'including' is perhaps more often than not the introductory term for an incomplete list of examples." *Adams v. Dole*, 927 F.2d 771, 776 (4th Cir. 1991). But, in that case, the word "including" could not be illustrative because it would have created a logical inconsistency. *See id.* at 777. No similar problem with reading "including" to carry its usual meaning is presented here.

25

term is often used to guide statutory interpretation even where it does not expand the scope of the previous clause. *See*, *e.g.*, *Bloate v. United States*, 559 U.S. 196, 206–07 (2010) (explaining that Congress used "including" as an "illustrative term" to indicate that non-enumerated proceedings might toll the accumulation of time under the Speedy Trial Act); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) (explaining that the choice of the word "includes" in a regulation "is significant because it makes clear that the examples enumerated in the text are intended to be illustrative"). It is implausible that Congress used a minor, technical amendment to the duties of a sub-cabinet officer to confer a sweeping power—unmentioned in and incompatible with the Byrne JAG statute and other grant programs—to place any conditions on more than $2 billion in formula-based grants at the AAG's whim.

The broader context also indicates that § 10102(a)(6) is not a freestanding source of authority. The clause is part of § 10102, which sets forth the "[d]uties and functions" of the AAG. 34 U.S.C. § 10102. The section lists six functions, two of which involve providing and publishing information, *id.* § 10102(a)(1), (3), two of which involve "maintain[ing] liaison" with various entities, *id.* § 10102(a)(2), (4), and

26

one of which requires coordinating and providing support to a series of other DOJ offices, *id.* § 10102(a)(5). As the Seventh Circuit explained: "A clause in a catch-all provision at the end of a list of explicit powers would be an odd place indeed to put a sweeping power to impose *any* conditions on *any* grants—a power much more significant than all of the duties and powers that precede it in the listing, and a power granted to the Assistant Attorney General that was not granted to the Attorney General." *City of Chicago*, 888 F.3d at 285 (emphasis original); *see also Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (explaining that courts should be reluctant to find "an enormous and transformative expansion" of an agency's authority in "ambiguous statutory text").

The DOJ suggests that unless the "including" clause confers a freestanding power to impose any and all conditions on a broad swath of grants, there would have been no reason to amend the statute to add the clause in 2006 (App. Br. 23–24). But, as the relevant amendment notes, it was intended to clarify the "coordination duties of [the] Assistant Attorney General" and add the Bureau of Justice Statistics as an agency that the AAG was required to "coordinate and provide staff support to coordinate the activities of." Pub. L. No. 109-162, § 1152, 119

27

Stat. 2960, 3113 (2006); 34 U.S.C. § 10102(a)(5). The amendment simply clarifies that placing special conditions is one of the powers that may be "vested" in the AAG or "delegated" by the Attorney General, but does not change the fact that the power must have some other source.

By contrast, when Congress intends to grant an administering agency the discretion to impose conditions, it does so directly. For example, in disbursing grants to combat violent crime against women Congress provided—in another provision within the same statutory subtitle as Byrne JAG—that "the Attorney General may impose reasonable conditions on grant awards." 34 U.S.C. § 10446(e)(3). And when the Secretary of the Interior awards matching funds for water projects, the governing statute directs that he may "establish any condition" that he "considers to be in the best interest of the Nation." 42 U.S.C. § 10305(a)(2). No similar provision exists here.

Nor has the DOJ explained how its new and expansive understanding of the term "special conditions" in § 10102 aligns with the term's historical usage as "a term of art for conditions intended for 'high-risk grantees' with difficulty adhering to existing grant requirements." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579,

617 (E.D. Pa. 2017). When Congress amended § 10102(a)(6) to add a reference to "special conditions," a DOJ regulation then defined the term to mean a time-limited condition to address financial or performance concerns specific to a particular applicant—for example, a requirement that a financially unstable grantee provide a more detailed financial report.[8] 28 C.F.R. § 66.12(a)–(b) (2006). The conditions here obviously have nothing to do with such concerns; instead, they are sweeping policy directives imposed on all grantees.

Finally, the DOJ also complains that the district court did not identify any independent authorization or delegation that would fit within its reading of § 10102(a)(6) (App. Br. 23). But there need not be any; the statute contemplates that such authority "may be" vested in the AAG or delegated, which does not necessarily mean that any present authority *is* vested. Nor does the imposition of other conditions on grants in the past suggest that the authority the DOJ claims here must exist (*id.* at 9). Those conditions were very different from the

---

[8] This reading is in accord with the current Byrne JAG solicitation, which notes that "as set out at 2 C.F.R. [§] 200.205, federal agencies must have in place a framework for evaluating the risks posed by applicants" (A249). The cited regulation, in turn, provides that, for higher-risk applicants, "special conditions that correspond to the degree of risk assessed may be applied to the Federal award." 2 C.F.R. § 200.205(b).

conditions proposed here: they either were authorized by the Byrne JAG statute or relate to how Byrne JAG funds are spent; were authorized by other federal statutes; or were advisory, rather than mandatory.[9] And even if grantees accepted some previous conditions without statutory authorization, there is no "administrative … adverse possession that insulates disregard of statutory text from judicial review." *Rapanos v. United States*, 547 U.S. 715, 752 (2006) (plurality opinion).

The DOJ's attempt to impose the challenged conditions on the basis of this thin statutory reed does not pass the red-face test. The district court's ruling on this point should be upheld.

### 3. Section 10353(a)(5)(D) does not authorize the § 1373 condition, and the DOJ concedes it does not support the notice and access conditions.

The DOJ also points to 34 U.S.C. § 10153(a)(5)(D) as a basis to impose the § 1373 condition, but not the notice and access conditions (App. Br. 26–27). Preliminarily, if the notice and access conditions are

---

[9] For example, the DOJ cites the conditions protecting human research subjects (App. Br. 9), but those conditions are set forth in regulations (A166 (citing 28 C.F.R. Part 46)), which are in turn authorized by statute, in this case 42 U.S.C. § 300v-1(b). These and other conditions largely track "general terms and conditions" required when "[f]ederal awarding agencies" make grants. 2 C.F.R. § 200.210(b).

unlawful, all that remains is the § 1373 condition, which, in addition to lacking statutory authorization, rests on an unconstitutional law, as described below (*see infra* at 43–54).

In any case, § 10153(a)(5)(D) merely provides that an applicant for a Byrne JAG grant must certify that it will "comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). This certification requirement, located in a subparagraph of a subsection of the provision outlining requirements for applications, does not have the sweeping effect that the DOJ claims.

The question, in interpreting the statute, is whether § 1373 is an "applicable Federal law" for the purpose of § 10153(a)(5)(D). It is not. As several courts and the district court have already held, the statutory phrase "applicable Federal law" refers to laws applicable to federal grants or grantees and not to a law like § 1373, which has nothing to do with grants. *See City of Philadelphia,* 916 F.3d at 291; *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 948–49 (N.D. Cal. 2018). For example, federal grantees cannot discriminate on the basis of "race, color, or national origin," 42 U.S.C. § 2000d, and must abide by restrictions on lobbying, 31 U.S.C. § 1352.

31

Reading the scope of the phrase "applicable Federal laws" to be thus limited makes sense for several reasons. First, the DOJ's reading is inconsistent with the structure of the Byrne JAG program as a formula grant, "under which a jurisdiction's award is calculated through a formula that considers only population and violent crime statistics." *City of Philadelphia*, 916 F.3d at 290; *see also City of Chicago*, 888 F.3d at 285 (explaining that as a formula grant, Byrne JAG "is structured so that the funds are allocated based on a carefully defined calculation"). The structure of Byrne JAG as a formula grant, which on its face limits the DOJ's discretion to deviate from the precise method of allocation that Congress prescribed, counsels against letting the DOJ grant itself that same authority through the back door.

Second, it is implausible that Congress buried the DOJ's ability to enforce compliance with all federal laws in a subparagraph of a subsection of the statute setting out the form of grant applications. Section 10153 sets out six requirements that an applicant must meet when applying for Byrne JAG funds, ranging from assuring that grant funds are not used to supplant normal criminal-justice funding to certifying coordination with an undefined group of "affected agencies."

32

34 U.S.C. § 10153(a)(1), (5)(C). The three subparagraphs preceding the "applicable Federal laws" subparagraph all relate to "the programs that will be funded under the grant." *City of Philadelphia*, 916 F.3d at 289. As the Third Circuit explained, "these narrow neighboring provisions counsel against a broad interpretation of the Applicable Laws Clause." *Id.* Instead, it is more reasonable to read "all other applicable Federal laws" as a reference to "laws that apply to operations relating to the grant, not to require the City to certify compliance with every single law that might apply to it," *id.* at 289–90, which could capture everything from the Affordable Care Act, to the Clean Water Act, to the Voting Rights Act, and innumerable other federal laws. It is absurd to imagine that vital law-enforcement funds could be withheld for failing to prescribe rules and procedures for cable television operators, for example. *See* 47 U.S.C. § 531(d).

Third, the legislative history of § 10153 confirms that Congress understood "applicable Federal laws" to refer to statutes governing the provision of federal money, not all federal law. Congress first enacted the "applicable Federal law" language in the Justice System Improvement Act of 1979, which reauthorized a predecessor to Byrne

33

JAG. *See* Pub. L. No. 96-157, 93 Stat. 1167, 1179–92 (1979). At the time the 1979 Act was drafted, the DOJ's Law Enforcement Assistance Administration (LEAA)—the agency responsible for administering law enforcement grants—issued guidance to grantees on their responsibilities under applicable federal laws. That guidance—part of the legislative backdrop—contained a list of statutes understood to apply to federal law enforcement grants and listed only statutes involving federal grant-making.[10]

Fourth, the DOJ's proposed reading would render the word "applicable" superfluous—a result it counsels against elsewhere in its brief (*see* App. Br. 23). The DOJ makes no attempt to explain what, if any, purpose the term "applicable" serves if its broad reading of the statute to encompass all other federal laws is correct. Instead, its reading would serve to render the word "superfluous, void, or insignificant." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (cleaned up). The case cited by the DOJ on this point is a perfect illustration of the

---

[10] *See, e.g.*, LEAA: Guideline Manual: Guide for Discretionary Grant Programs (Sept. 30, 1978); LEAA, General Briefing 6 (1977) (identifying twenty-three laws "applicable" to DOJ grants, and providing the National Environmental Protection Act and civil rights statutes as examples) (S.D.N.Y. ECF No. 33, Exs. 21, 26).

principle (App. Br. 27). There, the Supreme Court found that "[b]y itself, the phrase 'all other law' indicates no limitation." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991). But there is a critical difference between the all-encompassing phrase "all other law" and the more limited phrase "all other applicable Federal laws."

Fifth, the statutory chapter containing Byrne JAG helpfully provides its own rule of construction. It provides that "[n]othing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 34 U.S.C. § 10228(a). The legislative history of this provision confirms that Congress was concerned about the federal government's potential use of law enforcement grants to coerce states and localities to adopt federal law-enforcement priorities.[11] The Omnibus Crime Control and Safe Streets Act's supporters pointed to § 10228(a) as a bulwark

---

[11] *See*, *e.g.*, S. Rep. No. 90-1097, at 230 (1968) (views of Senators Dirksen, Hruska, Scott, and Thurmond) (expressing concern that the Act would enable the U.S. Attorney General to "become the director of state and local law enforcement").

against such federal encroachment, arguing that it would preclude the withholding of funds if local police departments are not run "the way the Attorney General says they must" be run.[12] Thus, even if there were some ambiguity about whether § 1373 was an applicable federal law, the rule of construction provided by Congress in § 10228(a) resolves any possible ambiguity in favor of local autonomy for criminal-justice agencies.

Finally, the imposition of the challenged condition violates the requirement that a recipient of grant funds have clear notice of any conditions on those funds, as the district court explained (A18–19). The DOJ is wrong to suggest that its interpretation does not raise issues under the clear-notice doctrine because the "grant materials" specify that an applicant must comply with § 1373 (App. Br. 27–28). The clear-notice rule is not about what an executive agency can add to the law in its execution, it is about what *Congress* states, and "Congress must express clearly its intent to impose conditions on the grant of federal

---

[12] *Controlling Crime Through More Effective Law Enforcement: Hearings Before the Subcomm. on Criminal Laws and Procedure of the S. Comm. on the Judiciary*, 90th Cong. 100, 384, 497 (1967) (discussing § 408 of the bill, which became § 10228(a)).

funds." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24 (1981). Thus, in the cases cited by the DOJ, the issue was whether the notice of congressional intent was sufficiently clear. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) ("The *statute* makes clear that ... students must not be denied access to educational benefits and opportunities on the basis of gender.") (emphasis added); *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 666 (1985) ("The requisite clarity in this case is provided by Title I[.]").[13]

The DOJ counters that, in other cases, Congress has limited certification more specifically to "all laws applicable to Federal grantees" (App. Br. 27). But its examples miss the mark. Its first example is not a certification by a *grantee* of compliance with anything, but rather a requirement that the *Secretary of Energy* must comply with "generally applicable Federal laws and regulations governing awards" when carrying out the National Civilian Community Corps Program. 42 U.S.C. § 16154(g)(1). Likewise, in its second example, the recipient of

---

[13] The language in *Bennett* quoted by the DOJ explaining that the "Federal Government simply could not prospectively resolve every possible ambiguity" (App. Br. 28), related to whether the ambiguities in the grant contract should be resolved against the United States as the drafter, not to the clear-notice requirement. *See Bennett*, 470 U.S. at 669.

federal funds makes a certification that it will follow federal law with regard to "the use of those funds," Pub. L. No. 113-121, § 1043(a)(3)(C)(ii)(II),128 Stat. 1193, 1246 (2014), a more limited certification than the statute at issue here, which requires compliance with all laws applicable to federal grantees in their capacity as grantees. And when Congress has seen fit to confer broader discretion to determine which laws are applicable, it says so. *See* 26 U.S.C. § 432(e)(9)(E)(iv)(II) (referencing compliance with "other applicable law, as determined by the Secretary of the Treasury").

The DOJ also references, without explicitly relying on, § 10153(a)(4) and (a)(5)(C), which, respectively, require the applicant to "maintain and report" certain data and to certify that "there has been appropriate coordination with affected agencies" (App. Br. 22). In fact, those sections amplify the conclusion that § 10153 speaks to technical and ministerial requirements for grant applications. As the Third Circuit recognized, the "data-reporting requirement is expressly limited to … information regarding the handling of federal funds and the programs to which those funds are directed" and the coordination requirement is in the past tense and does not "serve as a basis to

38

impose an *ongoing* requirement to coordinate on matters unrelated to the use of grant funds." *City of Philadelphia*, 916 F.3d at 285 (emphasis original). It is also not clear from the statute that the DOJ, as the grantor, is an "affected agenc[y]" with which coordination is required. 34 U.S.C. § 10153(a)(5)(C). Rather, that section more likely refers to coordination with other agencies outside the DOJ.

The subsection of the statute requiring certification of compliance with "all other applicable Federal laws" cannot bear the weight the DOJ places on it and does not support the § 1373 condition. It refers instead to laws applicable to the grant, as the district court found.

**B. In any event, it was arbitrary and capricious for the DOJ to dramatically change its approach to Byrne JAG funding with no meaningful analysis.**

In addition to lacking statutory authorization, the conditions fail for another reason. Even assuming the DOJ had the authority to place some extra-statutory conditions on Byrne JAG funding, what it did here was still "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A). The picture that emerges from the spare administrative record is unmistakable: an agency playing fast and loose with a quarter of a billion dollars earmarked by Congress to promote state and local criminal-justice

39

priorities in enumerated program areas. *See* 34 U.S.C. § 10152(a)(1). The DOJ conducted *no* study as to whether the conditions would help or harm that core congressional design, much less how. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (holding that it is arbitrary for an agency to rely on extra-statutory factors and fail to "consider an important aspect of the problem").

The DOJ contends that the conditions are a reasonable response to vague "public-safety threats" (App. Br. 39), but it conducted no study on any broader public-safety impact either. Nor did it grapple with the wealth of evidence that forcing state and local participation in federal immigration enforcement *undermines* public safety by deterring cooperation with law enforcement, public health officials, and others (A119–20; *see supra* at 10–11). In fact, the best the DOJ could do in this litigation is point to a one-page "Backgrounder" that simply asserts that the conditions would "improve the flow of information between federal, state, and local law enforcement, and help keep our communities safe" (S.D.N.Y. ECF No. 33, Ex. 17, at AR-993). That naked assertion is no substitute for what the law requires an agency to do: "examine the relevant data and articulate a satisfactory explanation for the action,

40

including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (cleaned up).

That is enough to set aside the conditions, but the DOJ also had a heavier burden because it sharply departed from past practice. Not only had it never imposed comparable conditions on Byrne JAG funding, it had concluded it lacked power to do so (S.D.N.Y. ECF No. 33, Ex. 9, at AR-113); it had recognized that withholding funding for non-compliance with immigration enforcement could have a "significant and unintended impact on the underserved local populations who benefit from [Byrne JAG] programs" (*id.*); and it had long understood the phrase "special conditions" to refer to conditions imposed on high-risk grantees, not any substantive condition of the DOJ's choosing (*see supra* at 28–29). And yet, the DOJ never offered a "reasoned explanation" for changing course, including a justification for "disregarding [the] facts and circumstances that underlay … the prior policy." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 516 (2009).

The DOJ's brief all but ignores the question of arbitrary-and-capricious review (App. Br. 38–39). Its halfhearted response miscasts the Byrne JAG statute as an immigration statute, when it is really

41

about furthering local criminal-justice priorities in enumerated areas that do not include immigration. *See* 34 U.S.C. § 10152(a)(1). Its other argument is that the § 1373 condition reflects a purely legal determination that § 1373 is an applicable federal law (*id.* at 38). But if it were so simple, there would have been no reason for the DOJ to require a new certification just for § 1373 (A266)—on top of the one governing compliance with "all other applicable federal laws" (A264)— and to warn applicants that the condition would be "handled differently" from past conditions (A243). In any case, the DOJ wrongly interpreted that phrase, as explained above (*see supra* at 30–39), and its argument on its own terms provides no justification for the separate notice and access conditions.

To this day, the DOJ has not explained how superimposing these conditions on the Byrne JAG program can reasonably be seen as consistent with the congressional design, and it certainly provided no such explanation when it made its determination. And it cannot. The conditions reflect a predetermined political preference, not reasoned administrative decision-making (*see supra* at 5–8).

42

## POINT II

### SECTION 1373 CONTRAVENES THE CONSTITUTION IN MULTIPLE WAYS

Setting the DOJ's conditions and the Byrne JAG program to one side, § 1373 itself is unconstitutional, and this Court should declare it so.[14] Our Constitution strikes a "healthy balance of power" by ensuring that states and their political subdivisions maintain sovereignty separate from the federal government. *Printz v. United States*, 521 U.S. 898, 920–21 (1997). As Madison put it, "the local or municipal authorities form distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general authority than the general authority is subject to them." Federalist No. 39. And though these sometimes-competing and sometimes-cooperating sovereignties may create inefficiencies, it is through them that we

---

[14] According to the DOJ, there's no need to reach this question given the district court's "restrictive reading" of "applicable Federal laws" under the Byrne JAG statute (App. Br. 30). But § 1373's unconstitutionality itself is one reason that it doesn't qualify as an applicable law. Moreover, the City separately sought a declaration that that § 1373 is unconstitutional (A132), and a concrete case or controversy arises from the DOJ's authoritative—albeit incorrect—interpretation and efforts to enforce it.

"protect[] the liberty of the individual from arbitrary power." *Bond v. United States*, 564 U.S. 211, 222 (2011).

Section 1373 undermines these pillars of federalism in two related ways—it purports to restrict the laws state and local governments may adopt, and it unlawfully commandeers state and local officials. This Court should hold, consistent with every court to pass on the issue in recent years, that § 1373 is unconstitutional. *See City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 331 (E.D. Pa. 2018) (finding that "Section 1373 violates the Tenth Amendment of the Constitution"), *aff'd in part, vacated in part on other grounds,* 916 F.3d 276 (3d Cir. 2019); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 872 (N.D. Ill. 2018) (finding that "Section 1373 impermissibly directs the functioning of local government in contravention of Tenth Amendment principles"); *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 953 (N.D. Cal. 2018) (finding that "Section 1373 is unconstitutional."); *see also United States v. California*, 314 F. Supp. 3d 1077, 1101 (E.D. Cal. 2018) ("The Court finds the constitutionality of Section 1373 highly suspect.").

44

**A. The statute impermissibly issues a direct order to state and local governments about the laws and policies they can and cannot adopt.**

Fundamental to our constitutional system is the principle that Congress has "the power to regulate individuals, not States." *New York v. United States*, 505 U.S. 144, 166 (1992). The Tenth Amendment effectuates that principle by prohibiting the federal government from exercising control over the legislative and policymaking apparatuses of states and their political subdivisions. *See id.* at 161. And encompassed within that prohibition is a bar on issuing "direct orders" to state and local governments. *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018).

Section 1373 does precisely what the Tenth Amendment prohibits. It speaks *directly* to state and local governments—regulating the conduct of any "State or local government entity or official"—and tells them that a broad swath of policies are off limits, dictating that they "may not prohibit, or in any way restrict any governmental entity or official" from exchanging certain information with federal immigration authorities. 8 U.S.C. § 1373(a) (cleaned up); *see also id.* § 1373(b) (specifying additional restrictions). The statute thus categorically bars state and local governments from adopting a range of laws and policies

45

that would guide their officials on how to handle immigration-related information specifically or personal or sensitive information generally.

To be sure, § 1373 works by telling states and cities that certain policies are out of bounds, rather than compelling them to affirmatively adopt a specific policy of the federal government's choosing. But that does not make one bit of difference. As the Supreme Court recently reaffirmed in *Murphy*—a decision striking down a federal law prohibiting states from authorizing sports betting—the distinction between "commanding affirmative action" and "imposing a prohibition" is "empty." 138 S. Ct. at 1478 (cleaned up). The Constitution does not countenance direct commands of either stripe. *See id.*

For much the same reason, the DOJ's reliance on this Court's prior ruling in *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999) is misplaced (App. Br. 30). That decision mistook the "empty" distinction between affirmative commands and prohibitions for a dispositive one: the linchpin of its analysis was that § 1373 is permissible because it "prohibit[s]" the enactment of restrictions on the exchange of information, rather than "compel[ing] state and local governments to enact" a federal program. *City of New York*, 179 F.3d at

46

34–35. That reasoning simply does not survive *Murphy*, as several courts, including the district court, have already found.[15] And in any case, the City's policies today are exactly the kind of "general polic[ies]"—those proscribing disclosure of a range of information to a range of actors, not a targeted limitation on the exchange of immigration-related information with immigration authorities—that this Court did not pass on then and, instead, strongly suggested would be protected by the Tenth Amendment. 179 F.3d at 36.

That leaves the DOJ with the specious claim that § 1373 is just a "preemption provision," beyond the reach of *Murphy* and the Tenth Amendment (App. Br. 33–36). But preemption works when Congress first "enacts a law that imposes restrictions or confers rights on private actors," and then, expressly or implicitly, blocks inconsistent state or local regulations of those private parties. *See Murphy*, 138 S. Ct. at 1480. The concept is just an application of the Supremacy Clause to

---

[15] *See New York v. United States Dep't of Justice*, 343 F. Supp. 3d 213, 234 (S.D.N.Y. 2018) ("It is clear that *City of New York* cannot survive the Supreme Court's decision in *Murphy*."); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 873 (N.D. Ill. 2018) ("*Murphy*'s holding deprives *City of New York* of its central support … ."); *United States v. California*, 314 F. Supp. 3d 1077, 1108 (E.D. Cal. 2018) ("[T]he Supreme Court's holding in *Murphy* undercuts portions of the Second Circuit's reasoning and calls its conclusion into question.").

Congress's power "regulate individuals, not States." *New York*, 505 U.S. at 166. Section 1373, however, has nothing to do with private parties: contrary to the DOJ's intimation (App. Br. 33), it neither regulates aliens nor prohibits states and local governments from adopting inconsistent laws governing them. Section 1373 directly regulates state and local governments and tells them which policies they can adopt vis-à-vis state and local officials in their official capacities. It is an assault on our federalist system, and the Tenth Amendment forbids it.

## B. The statute's sever-and-enlist gambit negates a core feature of sovereignty by breaking local control over local officials.

Section 1373 also runs afoul of the Tenth Amendment by conscripting state and local governments to assist in federal immigration enforcement. *See Printz*, 521 U.S. at 926. Make no mistake, § 1373 does something extraordinary: it precludes state and local governments from restricting "in any way" their own officials from taking sensitive information that has been entrusted to them only because they are government officials and then transferring it to the federal government. 8 U.S.C. § 1373(a), (b). The upshot is the statute:

48

- Denies state and local governments control over how their officials spend their time and the information they share;

- Transfers decision-making power from state and local policy-makers to line-level officials;

- Gives the federal government a free ride by appropriating information collected at state and local expense; and

- Deprives state and local governments of the "critical alternative" of declining to assist a federal program.

*See generally City of Chicago*, 321 F. Supp. 3d at 866–73; *City of Philadelphia*, 309 F. Supp. 3d at 329–31.

To be sure, § 1373 avoids directly compelling states and local governments to provide information to the federal government, but it does so only by declaring state and local officials "free agents" on that point. This back-door machination—severing the connection between a government and its own officials and attempting to enlist the latter in a federal scheme despite any objection by the former—is no less offensive to the Tenth Amendment than more traditional forms of commandeering. For the prohibition on commandeering to have meaning, it must be the case that the federal government cannot

49

"circumvent" it by conscripting state and local officials. *Printz*, 521 U.S. at 935. Nor should it make a difference that a federal statute prevents a government from controlling its own officials instead of affirmatively exercising control over them; that is just another flavor of the "empty" distinction the Supreme Court rejected in *Murphy*, 138 S. Ct. at 1478. Either way, the federal government has "direct[ed] the functioning" of state and local governments. *Printz*, 521 U.S. at 932. To sever the ties between them and their officials goes to "the heart of state sovereignty." *City of Chicago*, 321 F. Supp. 3d at 869.

In response, the DOJ suggests that state and local governments can exercise their fundamental police powers only if they do not "hinder the federal government" (App. Br. 35). This is a breathtaking claim, one that mistakes our federalist system for an imperialist one. By design, our Constitution "divides power among sovereigns … precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day." *New York*, 505 U.S. at 187. To be sure, federal immigration authorities may find it inconvenient when the City refuses to pay City officials to use City resources to *facilitate* this administration's immigration priorities, but that is a

50

testament to the Founders' vision, not an indictment of it. *See City of Chicago*, 888 F.3d at 282 (explaining that "nothing in this case involves any affirmative *interference*" with law enforcement or immigration but rather the "only conduct at issue here is the refusal of the local law enforcement to aid in civil immigration enforcement") (emphasis original). When the City takes a criminal suspect into custody, it is not a "scheme" that must give way to federal immigration authorities (App. Br. 35), but the exercise of one of the most basic powers reserved to states and localities by the Tenth Amendment. The DOJ's argument, moreover, ignores that § 1373 applies to "any individual," not just aliens in custody, and thus has a far broader sweep than it suggests.

To be clear, when sovereignty is fractured, political accountability suffers. Illustrating the point, the DOJ's take on § 1373 can prevail only by overriding the City's implementation of the will of its electorate: our policies trace back to the City's voters going to polls and proclaiming that it is "essential to the workings of city government that the city retain control over information obtained by city employees" and that the City should protect the "private information that [is] provided" to City employees. N.Y.C. Charter § 8(g). No matter what the DOJ may believe

51

(App. Br. 35–36), the political accountability concerns behind the anticommandeering doctrine are triggered when a locality "cannot regulate in accordance with the views of the local electorate." *New York*, 505 U.S. at 169. And, accepting the DOJ's assumption that the focus is on immigration enforcement rather than the handling of sensitive information, even on that front it will be far from clear to the public whether it is a federal, state, or local policy—or some combination—that is at work when state and local governments are barred from "adopting policies contrary to those preferred by the federal government." *City of Chicago*, 321 F. Supp. 3d at 870.

In a last-ditch effort, the DOJ tries to salvage § 1373 by calling it an information-sharing provision (App. Br. 36). But the Supreme Court has never held that "purely ministerial reporting requirements" are constitutionally permissible. *Printz*, 521 U.S. at 936 (O'Connor, J., concurring). Moreover, the Supreme Court in *Printz* distinguished statutes that require "*only* the provision of information to the Federal Government." 521 U.S. at 918 (emphasis added). But § 1373 is "more than just an information-sharing provision." *City of Chicago*, 321 F. Supp. 3d at 872. It "require[s] the States in their sovereign capacity" to

refrain from enacting certain regulations; it does not simply "regulate[]" the States as the owners of databases" and require the provision of information in those databases to the federal government. *Reno v. Condon*, 528 U.S. 141, 151 (2000). This is illustrated by the disruption of state and local governments' relationships with residents and the political accountability costs of § 1373 (*see supra* at 51–52), which a mere information-provision statute would not occasion.

* * *

Viewing § 1373 from any angle, a "more direct affront to state sovereignty is not easy to imagine." *Murphy*, 138 S. Ct. at 1478. While it does not matter from a constitutional perspective whether the City's approach to sensitive information is good policy, experience has taught us that limiting the disclosure of a range of sensitive information—from sexual orientation to immigration-related information—is critical in accomplishing public initiatives in areas as diverse as crime prevention, disease control, and education (*see supra* at 10–11). That experience finds parallels with that of states and cities across the country, and indeed the federal government's own, as it too has used confidentiality guarantees to foster broader participation in federal programs,

53

including by undocumented immigrants. *See, e.g.*, 13 U.S.C. § 9(a) (census); 26 U.S.C. § 6103 (federal taxes).

And, although the holding of *City of New York* no longer obtains, these insights from the case still do: gathering information is "essential to the performance of a wide variety of state and local governmental functions," discharging those functions will be "difficult or impossible if some expectation of confidentiality is not preserved," and maintaining confidentiality may "require that state and local governments regulate the use of such information by their employees." 179 F.3d at 36. Section 1373, in contrast, leaves the dissemination of sensitive information to the whim and caprice of individual officials, making ad hoc and inconsistent decisions on government time and with government resources, without uniform instructions from their governments.

This is a recipe for arbitrary government action. Fortunately, the Constitution requires no such thing; instead, it guards against it.

## CONCLUSION

The district court's order should be affirmed.

Dated:  New York, NY
        April 17, 2019

                        Respectfully submitted,

                        ZACHARY W. CARTER
                        *Corporation Counsel*
                        *of the City of New York*


                By:   */s/  Jamison Davies*
                      JAMISON DAVIES
                      Assistant Corporation Counsel

                      100 Church Street
                      New York, NY 10007
                      212-356-2490
                      jdavies@law.nyc.gov

RICHARD DEARING
DEVIN SLACK
JAMISON DAVIES
    *of Counsel*

55

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word 2010, and according to that software, it contains 10,085 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____*/s/ Jamison Davies*_____
JAMISON DAVIES