# 19-267(L)

19-275(CON)

## United States Court of Appeals
## for the Second Circuit

---

STATE OF NEW YORK, STATE OF CONNECTICUT, STATE OF NEW JERSEY,
STATE OF WASHINGTON, COMMONWEALTH OF MASSACHUSETTS,
COMMONWEALTH OF VIRGINIA, STATE OF RHODE ISLAND, CITY OF NEW YORK,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF JUSTICE, WILLIAM P. BARR,
in his official capacity as Attorney General of the United States,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEES STATES OF NEW YORK, CONNECTICUT, NEW JERSEY, RHODE ISLAND, AND WASHINGTON, AND COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA

BARBARA D. UNDERWOOD
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
ERIC R. HAREN
  *Special Counsel*
LINDA FANG
  *Assistant Solicitor General*
    *of Counsel*

*Counsel listing continues on signature pages.*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for State Appellees
28 Liberty Street
New York, New York 10005
(212) 416-8656

Dated: April 17, 2019

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................iii

PRELIMINARY STATEMENT ................................................................ 1

QUESTIONS PRESENTED ..................................................................... 3

STATEMENT OF THE CASE ................................................................. 4

    A.    Factual Background............................................................. 4

            1.    The Edward Byrne Memorial Justice Assistance
                Grant (Byrne JAG) program ............................................. 4

            2.    The state plaintiffs' use of Byrne JAG funds.................... 7

            3.    The U.S. Department of Justice's (DOJ) imposition
                of three immigration-related eligibility
                requirements on Byrne JAG awards................................. 9

    B.    Related Litigation ................................................................ 10

    C.    Procedural History................................................................ 11

STANDARD OF REVIEW....................................................................... 13

SUMMARY OF ARGUMENT ................................................................. 14

ARGUMENT ......................................................................................... 18

POINT I

THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE
CHALLENGED CONDITIONS ARE UNLAWFUL......................................... 18

    A.    The Byrne JAG Statute Does Not Permit the U.S.
        Attorney General to Impose New Eligibility
        Requirements on Byrne JAG Recipients............................... 18

i

**Page**

B.   The Challenged Conditions Are Not Authorized by
     34 U.S.C. § 10102(a)(6). ........................................................ 23

C.   The New Requirements Are Not Authorized by
     34 U.S.C. § 10153. ................................................................. 32

D.   The § 1373 Requirement Is Also Unlawful Because
     § 1373 Violates the Tenth Amendment. ................................. 40

E.   The Challenged Conditions Are Inconsistent with
     34 U.S.C. § 10228(a) Because They Seek to Direct and
     Control the Actions of State and Local Law
     Enforcement. ........................................................................... 46

POINT II

THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT
ON THE STATES' ADMINISTRATIVE PROCEDURE ACT (APA) AND
SEPARATION-OF-POWERS CLAIMS ........................................................ 50

A.   DOJ's Unauthorized and Arbitrary and Capricious
     Actions Violates the APA. ...................................................... 50

B.   DOJ's Unlawful Actions Violates the Constitution's
     Separation of Powers. ............................................................. 54

CONCLUSION ...................................................................................... 56

ii

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Adams v. Zasnel,*
619 F.3d 156 (2d Cir. 2010) ............................................................... 43

*Ali v. Federal Bureau of Prisons,*
552 U.S. 214 (2008) ............................................................................. 46

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984) ............................................................................. 34

*City and County of San Francisco v. Sessions,*
349 F. Supp. 3d 924 (N.D. Cal. 2018) ........................................ passim

*City and County of San Francisco v. Trump,*
897 F.3d 1225 (9th Cir. 2018) .................................................. 22-23, 55

*City of Chicago v. Sessions,*
321 F. Supp. 3d 855 (N.D. Ill. 2018) ...................................... 10, 42, 43

*City of Chicago v. Sessions,*
888 F.3d 272 (7th Cir. 2018) ....................................................... passim

*City of Los Angeles v. McLaughlin,*
865 F.2d 1084 (9th Cir. 1989) ....................................................... 18-19

*City of New York v. United States,*
179 F.3d 29 (2d Cir. 1999) ........................................................... 42, 43

*City of Philadelphia v. Attorney General of the United States,*
916 F.3d 276 (3d Cir. 2019) ........................................................ passim

*City of Philadelphia v. Sessions,*
280 F. Supp. 3d 579 (E.D. Pa. 2017) ................................................. 25

*City of Philadelphia v. Sessions,*
309 F. Supp. 3d 289 (E.D. Pa. 2018) ................................................. 42

**Cases**                                                   **Page(s)**

*Department of Homeland Sec. v. MacLean,*
   135 S. Ct. 913 (2015) ............................................................... 19

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ............................................................... 23

*Federal Commc'ns Comm'n v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ............................................................... 51

*Freedom Holdings, Inc. v. Cuomo,*
   624 F.3d 38 (2d Cir. 2010) ............................................................... 13

*Iavorski v. INS,*
   232 F.3d 124 (2d Cir. 2000) ............................................................... 34-35

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ............................................................... 51

*Louisiana Pub. Serv. Comm'n v. FCC,*
   476 U.S. 355 (1986) ............................................................... 54

*McDermott Int'l, Inc. v. Wilander,*
   498 U.S. 337 (1991) ............................................................... 27, 38

*Mitchell v. City of New York,*
   841 F.3d 72 (2d Cir. 2016) ............................................................... 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
   *Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................... 53

*Murphy v. National Collegiate Athletic Ass'n,*
   138 S. Ct. 1461 (2018) ............................................................... passim

*Natural Res. Def. Council v. National Highway Traffic*
   *Safety Admin.,*
   894 F.3d 95 (2d Cir. 2018) ............................................................... 50

## Cases                                                            Page(s)

*Neustar, Inc. v. Federal Commc'ns Comm'n,*
   857 F.3d 886 (D.C. Cir. 2017) ............................................................. 35

*Printz v. United States,*
   521 U.S. 898 (1997) ........................................................................ 48, 49

*South Dakota v. Dole,*
   483 U.S. 203 (1987) .............................................................................. 45

*United States v. California,*
   314 F. Supp. 3d 1077 (E.D. Cal. 2018) ......................................... 41-42

## Laws

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 ........ 4

Justice Assistance Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837 .......... 4

Justice System Improvement Act of 1979, Pub. L. No. 96-
   157, 93 Stat. 1167 ........................................................................... 4, 37

Omnibus Crime Control and Safe Streets Act of 1968,
   Pub. L. No. 90-351, 82 Stat. 197 ...................................................... 4, 46

Violence Against Women and Department of Justice
   Reauthorization Act of 2005, Pub. L. No. 109-162, 119
   Stat. 2960 (2006) .................................................................................. 4

5 U.S.C. § 706 ......................................................................................... 50

8 U.S.C. § 1373 .............................................................................. passim

34 U.S.C.
   § 10102 ....................................................................................... 14, 24
   § 10110 ............................................................................................ 24
   §§ 10151-58 ................................................................................. 5, 20
   § 10151 *et seq.* .................................................................................. 1
   § 10152 ................................................................................... passim
   § 10153 ................................................................................... passim

**Laws**                                                                    **Page(s)**

34 U.S.C. (*cont'd*)

§ 10156 ..................................................................... passim

§ 10157 ........................................................................... 19

§§ 10171-91 .................................................................... 20

§ 10228 ........................................................ 2, 21, 46, 47

§ 20927 ........................................................................... 20

§ 30307 ........................................................................... 20

42 U.S.C. § 3756 (2000) ......................................................... 20

2 C.F.R. § 200.207 ...................................................... 27, 28, 29

28 C.F.R.

§ 46.103 .......................................................................... 29

§ 66.12 (2006) ....................................... 26, 27, 28, 29

53 Fed. Reg. 8,034 (Mar. 11, 1988) ....................................... 26

79 Fed. Reg. 75,872 (Dec. 19, 2014) ..................................... 27

**Legislative History**

H.R. Rep. No. 103-694 (1994) .................................................. 22

H.R. Rep. No. 109-233 (2005)...................................... 5, 21, 32

S. Rep. No. 90-1097 (1968) ............................................... 5, 47

*Amendments to Title I (LEAA) of the Omnibus Crime Control and Safe Streets Act: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Judiciary Comm.,* 94th Cong. (1976)................................................................ 38

*Controlling Crime Through More Effective Law Enforcement: Hearings Before the Subcomm. on Criminal Laws and Procedure of the S. Comm. on the Judiciary,* 90th Cong. (1967) ....... 47

Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2015) ...................................................................... 22

**Legislative History** **Page(s)**

*Federal Assistance to State and Local Criminal Justice Agencies: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Comm. on the Judiciary*, 95th Cong. (1978) ..................................................... 39

Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. (2015) ....................................................... 22

*Restructuring the Law Enforcement Assistance Administration: Hearings Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 95th Cong. (1977) ........................ 39

Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016) ....................................................... 22

Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016) ..... 22

Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015) ........................ 22

Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015) ............................................... 22

Violent Crime Control and Law Enforcement Act of 1994 H.R. 3355, 103d Cong. (version dated Nov. 19, 1993) ........................ 22

**Miscellaneous Authorities**

Dep't of Justice, Law Enforcement Assistance Admin., *General Briefing* (1977) ........................................ 38

Dep't of Justice, Law Enforcement Assistance Admin., *Guideline Manual: Guide for Discretionary Grant Programs* (1978) ................ 38

Dep't of Justice, Office of Justice Programs, *Byrne JAG Program: FY 2018 State Solicitation, at* https://www.bja.gov/funding/JAGState18.pdf ............................ 12, 28

**Miscellaneous Authorities** **Page(s)**

Dep't of Justice, *Restructuring the Justice Department's Program of Assistance to State and Local Governments for Crime Control and Criminal Justice System Improvement* (June 23, 1977) ............................................................... 39, 40

John K. Hudzik et al., *Federal Aid to Criminal Justice: Rhetoric, Results, Lessons* (1984) ......................................... 47

*Letter from Assistant Attorney General Peter J. Kadzik to Senator Richard Shelby* (Sept. 10, 2015) .................................... 52, 53

Malcolm S. Mason, *Monitoring of Grantee Performance, in Federal Grant Law* (Malcolm S. Mason ed., 1982) ............................ 26

Office of Representative Peter W. Rodino, Press Release, *Committee Approves LEAA Reorganization* (May 10, 1979) .............. 39

Paul G. Dembling & Malcolm S. Mason, *Essentials of Grant Law Practice* (1991) ................................................... 18, 26

## PRELIMINARY STATEMENT

The Edward Byrne Memorial Justice Assistance Grant (Byrne JAG) program is a formula grant that Congress designed to ensure that states and localities have a reliable stream of funding to support local law-enforcement related programs tailored to local needs. *See* 34 U.S.C. § 10151 *et seq.* The plaintiff States of New York, Connecticut, New Jersey, Rhode Island, Washington, and the Commonwealths of Massachusetts and Virginia (the States) have received grants through the Byrne JAG program and its predecessors for decades, and have relied on those funds to support a diverse array of programs consistent with state and local law-enforcement priorities—including programs directed at community outreach, drug treatment, and advocacy for crime victims.

The U.S. Department of Justice (DOJ) now wrongly claims authority to impose certain immigration-related conditions on the Byrne JAG funds appropriated by Congress, and to withhold such funds for non-compliance with these new requirements. The U.S. District Court for the Southern District of New York (Ramos, J.) granted summary judgment for the States and permanently enjoined the conditions. This Court should affirm.

The district court properly concluded that DOJ has no authority to withhold Byrne JAG funding from States and localities based on eligibility criteria of DOJ's own choosing. DOJ's position is contrary to the text, structure, and history of the Byrne JAG statute. Nothing in the text or legislative history of the Byrne JAG statute indicates any intent by Congress to tie the Byrne JAG program to federal immigration enforcement, and no provision of the Byrne JAG statute requires that States and localities affirmatively assist in federal immigration efforts as a condition of receiving grant funds. None of the statutory provisions identified by DOJ grants DOJ the open-ended power to condition funding on adherence to DOJ's own policy objectives. Indeed, the power claimed by DOJ is fundamentally inconsistent with the nature of the Byrne JAG program, which Congress established as a mandatory formula grant. The challenged conditions further run afoul of 34 U.S.C. § 10228(a), a federal law that prohibits federal officials from using Byrne JAG grants as a means to direct or control local law-enforcement activities.

The district court also correctly concluded that DOJ may not demand compliance with 8 U.S.C. § 1373 as a condition of Byrne JAG eligibility. Among other things, § 1373 violates the Tenth Amendment by

prohibiting state and local governments from enacting rules that restrict when their employees may share information with the federal government about the immigration status of any individuals known to them, regardless of whether those individuals have had any contact with the criminal justice system.

Because DOJ lacks the statutory authority to impose the new requirements, and because its attempt to withhold funds that Congress has appropriated to the States coopts Congress's exclusive spending power, the district court properly granted summary judgment to the States.

## QUESTIONS PRESENTED

1.      Whether the district court properly concluded that DOJ's new immigration-related conditions on Byrne JAG grants are unauthorized by statute and contrary to law?

2.      Whether the district court properly concluded that DOJ's actions in imposing the challenged immigration-related requirements on Byrne JAG grants violates the Administrative Procedure Act and the Constitution's separation of powers?

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    The Edward Byrne Memorial Justice Assistance Grant (Byrne JAG) program

Byrne JAG has its origins in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. I, 82 Stat. 197, which created the first block grants for States and localities to use for law-enforcement and criminal justice programs.[1] Recognizing that "crime is essentially a local problem that must be dealt with by State and local governments," 82 Stat. at 197, Congress designed the grant to provide a reliable funding stream that States and localities could use in accordance with state and local law-enforcement priorities, and for state and local law-enforcement

---

[1] *See* Justice System Improvement Act of 1979, Pub. L. No. 96-157, 93 Stat. 1167, 1179 (amending Title I of the 1968 Act and reauthorizing law-enforcement block grants to States and localities); Justice Assistance Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, 2077-85 (same); Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, pt. E, 102 Stat. 4181, 4329 (amending Title I of the 1968 Act and creating formula law-enforcement grant); Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006) (amending Title I of the 1968 Act and creating the modern Byrne JAG program).

4

purposes.[2]

The modern Byrne JAG program was codified in 2006. *See* 34 U.S.C. §§ 10151-58. Like its predecessors, Byrne JAG aims to "give State and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). To that end, the statute creates a formula grant and gives recipients substantial discretion to use funds for eight "broad purposes," *id.*, including law enforcement, prevention and education programs, and drug treatment, 34 U.S.C. § 10152(a)(1).

Every State is eligible to receive Byrne JAG funds in an amount determined by a statutory formula based on two factors: population and crime rate. *Id.* § 10156(a), (d). Congress makes an annual appropriation for the program, and "[o]f the total amount appropriated" by Congress, the U.S. Attorney General "shall," aside from a limited exception not relevant here, "allocate" fifty percent of the funds based on each State's

---

[2] *See* S. Rep. No. 90-1097, at 2 (1968), ECF No. 58-19 (stating that Congress sought to encourage States and localities to adopt programs "based upon their evaluation of State and local problems of law enforcement"). As used herein, all citations to ECF No. 58-___ are to exhibits attached to the Declaration of Nancy M. Trasande, ECF No. 58.

population and fifty percent based on each State's crime rate. *Id.* § 10156(a)(1). In each State, sixty percent of funding "shall be for direct grants to States," *id.* § 10156(b)(1), and forty percent "shall be for grants" directly to localities (compared within a State based on crime rate), *id.* § 10156(b)(2), (d). Each State is additionally required to allocate portions of its award to localities or community organizations within the State as subgrantees. *Id.* § 10156(c)(2). Under this system, some localities thus may receive Byrne JAG funds as both direct grantees and subgrantees.

DOJ administers the Byrne JAG program through its Office of Justice Programs (OJP). (Joint Appendix (JA) 185.) To "request" the grant funds appropriated by Congress, a State or locality must submit an application "in such form as the Attorney General may require." 34 U.S.C. § 10153(a). The application must include, among other things, a comprehensive plan detailing the applicant's proposed use of grant funds, *id.* § 10153(a)(6), and assurances related to recordkeeping and proper use of funds, *id.* § 10153(a)(1), (4). The application must also contain "[a] certification, made in a form acceptable to the Attorney General," attesting that, among other things, "the applicant will comply

6

with all provisions of [the Byrne JAG statute] and all other applicable Federal laws." *Id.* § 10153(a)(5)(D).

### 2. The state plaintiffs' use of Byrne JAG funds

The States have been recipients of Byrne JAG funds since the program's inception in 2006, and some have received funds through Byrne JAG's predecessor programs for many years prior. *See* Defs.' Resp. to Pls.' Local Rule 56.1 Statement ¶¶ 66, 83, 89, 95, 101, 107, ECF No. 89-1 ("Defs.' 56.1 Resp."). The States, along with their many subgrantees, have relied on Byrne JAG funds over the years to support a broad array of critical law-enforcement programs tailored to local needs. For example, New York has relied on Byrne JAG funds to support gun violence prevention programs, enhance local prosecution and defense services across numerous counties, and to help local jurisdictions fund the purchase and installation of upgraded fingerprinting equipment. *See id.* ¶¶ 71-72. Connecticut has used its Byrne JAG grant to fund stipends for local police participation in the statewide narcotics task force, and to support opioid intervention efforts. Decl. of Michael P. Lawlor ¶ 18, ECF No. 62 ("Lawlor Decl."). Some of the programs funded in Massachusetts by Byrne JAG monies include those supporting community outreach in

high-risk areas and for at-risk youth, and reentry services for juvenile and adult offenders. Defs.' 56.1 Resp. ¶¶ 84-85. New Jersey has historically relied on Byrne JAG funds to support its multi-jurisdictional gangs, organized crime, and narcotics task force, and to purchase body worn cameras for numerous municipal police departments. *Id.* ¶ 91. Rhode Island has used Byrne JAG to fund its drug courts, and provide residential substance abuse treatment for prisoners and mental health evaluations for juvenile offenders. *Id.* ¶ 96. In recent years, Virginia has relied on grant funds to upgrade law-enforcement equipment, improve specialized training, and purchase life-saving medication for combating opioid overdoses. *Id.* ¶ 103. Washington has used Byrne JAG funds to support legal advocacy programs for domestic violence victims, and to aid tribal law enforcement efforts. *Id.* ¶¶ 109, 112. Without Byrne JAG funds, many of these programs would go unfunded or be curtailed because no alternative state funds are budgeted for their support. *Id.* ¶¶ 79, 99-100, 113.

For FY 2017, the States were collectively awarded more than $25 million in Byrne JAG funds, including approximately: $8.9 million to New York; $1.7 million to Connecticut; $3.5 million to Massachusetts;

8

$4.0 million to New Jersey; $0.8 million to Rhode Island; $3.4 million to Virginia; and $3.3 million to Washington. *Id.* ¶¶ 69, 77, 86, 92, 98, 104, 111.

### 3. The U.S. Department of Justice's (DOJ) imposition of three immigration-related eligibility requirements on Byrne JAG awards

In July 2017, DOJ announced that it was imposing three new immigration-related conditions on FY 2017 Byrne JAG funds. The first two conditions require grant recipients to have "in place" a "State statute, or a State rule, -regulation, -policy, or -practice" (1) to ensure federal officials access to state and local correctional facilities to question individuals about their right to remain in the United States (the "Access requirement"); and (2) to provide federal authorities, upon a written request, with advance notice of a particular individual's scheduled date of release from state and local custody (the "Notice requirement"). (JA 291.) The third condition (the "§ 1373 requirement") imposes a number of requirements relating to 8 U.S.C. § 1373, which prohibits States and localities from restricting communications between their officials and federal immigration authorities regarding the citizenship or immigration status of any individual. (JA 222, 224, 288-290.) Among other things, the § 1373 requirement mandates all grantees, as well as subgrantees, to

9

certify compliance with § 1373, and further requires that all direct grantees monitor their subgrantees for compliance with § 1373 during the duration of a Byrne JAG award, and report any suspected § 1373 violations by subgrantees to DOJ. (JA 288-290.)

On June 26, 2018, DOJ notified the States that they were eligible to receive their FY 2017 Byrne JAG allocations, provided that they accepted their respective awards with the new requirements within forty-five days. (*See, e.g.*, JA 270.)

## B. Related Litigation

Since DOJ's 2017 announcement, the immigration-related conditions have been the subject of a number of legal challenges by localities and States. Those challenges have uniformly resulted in injunctions restraining DOJ from imposing the conditions.[3] At the

---

[3] *See City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 879-82 (N.D. Ill. 2018) (permanently enjoining all conditions on nationwide basis, but partly staying the permanent injunction to limit its effect to only the plaintiff jurisdiction pending appeal), *appeal argued* Apr. 10, 2019, No. 18-2885 (7th Cir.); *City and County of San Francisco v. Sessions* and *California v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018) ("*California Actions*") (same), *appeals filed* Dec. 4, 2018, Nos. 18-17308, 18-17311 (9th Cir.); Order, *Illinois v. Sessions*, No. 18-cv-4791 (N.D. Ill. Sept. 26, 2018), ECF No. 25 (same); Order, *City of Los Angeles v. Sessions*, No. 17-cv-7215

appellate level, the Third Circuit recently affirmed a permanent injunction against imposition of all three conditions, and the Seventh Circuit affirmed a preliminary injunction restraining the Notice and Access requirements—the only conditions before the Seventh Circuit at that time. *See City of Philadelphia v. Attorney General of the United States*, 916 F.3d 276, 279 (3d Cir. 2019); *City of Chicago v. Sessions*, 888 F.3d 272, 287 (7th Cir.), *vacated in part on other grounds*, 2018 WL 4268817 (2018).

## C. Procedural History

On July 18, 2018, the States commenced the instant action. The States' complaint alleged that DOJ lacked the authority to impose the new immigration-related Byrne JAG requirements, and that DOJ's *ultra vires* actions therefore violated the Constitution's separation of powers and the Administrative Procedure Act (APA). The complaint alleged that § 1373 requirement was further unlawful because § 1373 violated the

---

(C.D. Cal. Sept. 13, 2018), ECF No. 93 (preliminarily enjoining all conditions), *appeal argued* Apr. 10, 2019, No. 18-56292 (9th Cir.); Order, *City of Evanston v. Sessions*, No. 18-cv-4853 (N.D. Ill. Aug. 9, 2018), ECF No. 23 (preliminarily enjoining all conditions in action joined by the U.S. Conference of Mayors on behalf of approximately 250 cities).

11

Tenth Amendment. The States sought injunctive, declaratory, and mandamus relief.[4] The City of New York (the City), a direct Byrne JAG grantee, also filed its own action challenging the same conditions.[5]

The States and the City respectively moved for partial summary judgment with respect to the FY 2017 Byrne JAG conditions, and DOJ cross-moved to dismiss the amended complaints or for partial summary judgment. In November 2018, the United States District Court for the Southern District of New York (Ramos, J.) issued a detailed 43-page decision and order concluding that DOJ lacked statutory authority to impose any of the challenged conditions, and had acted arbitrarily and capriciously in imposing the immigration-related conditions. The district

---

[4] On July 20, 2018, DOJ released solicitations for FY 2018 Byrne JAG funding. *See* DOJ, OJP, *Byrne JAG Program: FY 2018 State Solicitation*. In addition to imposing the Notice, Access, and § 1373 requirements, the solicitations stated that grantees would be required to execute certifications pertaining to six additional federal immigration-related laws in order to receive FY 2018 Byrne JAG awards. In August 2018, the States amended their complaint to include claims based on the FY 2018 conditions. Briefing on the parties' dispositive motions relating to the FY 2018 conditions is currently pending before the district court.

[5] Although the City's complaint contained certain additional claims not asserted by the States, the district court consolidated briefing on the parties' respective dispositive motions concerning the FY 2017 conditions because of the substantial overlap of the legal issues across the actions.

court also concluded that § 1373 was unconstitutional because it violated the Tenth Amendment's anti-commandeering prohibition. (JA 1-43.) The district court accordingly (1) granted partial summary judgment to the States and to the City (with respect to the FY 2017 conditions) on their separation-of-powers and APA claims; (2) permanently enjoined DOJ's imposition of the challenged conditions as against the States, the City, and any of their respective agencies or political subdivisions; (3) declared § 1373 unconstitutional as applied to the States and the City; and (4) mandated DOJ to issue the Byrne JAG awards to the States and the City without regard to the challenged conditions. (JA 42-43, 45.)

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of summary judgment. *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016). On *de novo* review, this Court may affirm based on "any ground appearing in the record." *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 49 (2d Cir. 2010).

## SUMMARY OF ARGUMENT

The district court correctly granted summary judgment for the States and permanently enjoined DOJ from conditioning Byrne JAG funds on compliance with DOJ's new immigration-related requirements. No provision of the Byrne JAG statute, or any other statute identified by DOJ, authorizes the agency to depart from the mandatory formula for grant allocation and disbursement established by Congress, based on criteria of DOJ's own choosing. Moreover, nothing in the text or history of the Byrne JAG statute suggests that Congress intended to condition grant funds on state and local assistance with federal immigration enforcement.

Every court to have considered the question has rejected DOJ's claim that 34 U.S.C. § 10102(a)(6)—a statute outside of the Byrne JAG scheme—independently authorizes DOJ to withhold Byrne JAG funds unless a grantee agrees to provide federal authorities with access to a grantee's correctional facilities (the "Access requirement"), and advance notice of an alien's release from the grantee's custody (the "Notice requirement"). Instead, as the district court correctly held, § 10102(a)(6) merely enables the Assistant Attorney General for OJP to set special

14

conditions and priority purposes while disbursing funds, to the extent other laws authorize those conditions and priorities. Section 10102(a)(6) does not permit DOJ to introduce new grant requirements unintended by Congress, in disregard of Congress's decision to constitute the Byrne JAG program as a mandatory formula grant.

In any event, the Notice and Access requirements are not "special conditions" or "priority purposes" within the meaning of § 10102(a)(6). In the grantmaking context, federal agencies and DOJ itself have long understood the term "special conditions" to exclude generally-applicable conditions like the Notice and Access requirements, which are not tailored to mitigate grantee-specific performance and financial risks, and which apply regardless of how funds are used. DOJ's position is inconsistent with its own grant-administration practices.

Nor are any of the challenged requirements authorized by 34 U.S.C. § 10153—an administrative provision that merely permits DOJ to determine the form of Byrne JAG applications and certifications. The district court properly rejected DOJ's contention that the provision of § 10153(a)(5)(D) that requires an applicant for Byrne JAG funds to certify that it will comply with "all provisions of this part and all other applicable

15

Federal laws" in "a form acceptable to the Attorney General" gives DOJ open-ended discretion to determine what is an "applicable Federal law." The text, structure, and history of § 10153 confirm that "applicable Federal law" refers only to federal statutes that relate to the Byrne JAG program or to the grantmaking process, and not every federal statute that could conceivably apply to a Byrne JAG grantee.

Contrary to DOJ's arguments, 8 U.S.C. § 1373 is not an "applicable" law within the meaning of 34 U.S.C. § 10153 because § 1373 has nothing to do with the Byrne JAG program or grantmaking. DOJ is similarly wrong in presenting the § 1373 requirement as a mere information-sharing requirement designed to facilitate coordination between federal immigration and local law enforcement activities. The plain text of § 1373 provides that state and local governments may not restrict their employees from disclosing information to the federal government about the immigration status of any individual—irrespective of whether the individual has *any* connection to state and local criminal justice systems. The § 1373 requirement thus violates the Tenth Amendment's anti-commandeering proscription because it directs state and local governments to refrain from enacting rules governing their own

16

employees' conduct, in contravention of the principles recognized in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).

The district court correctly concluded that DOJ violated the APA by acting "in excess of [its] statutory jurisdiction" when it imposed the challenged conditions even though not permitted to do so by Congress. (JA 12 (quotation marks omitted).) DOJ further acted arbitrarily and capriciously in failing to acknowledge its own prior contrary position— that the agency lacked the authority to condition formula grant funds on requirements not prescribed by Congress—when it imposed the new immigration-related requirements in 2017 for the first time in the Byrne JAG program's history. DOJ's failure to provide any explanation for its abrupt departure from the agency's longstanding practice in the administration of the Byrne JAG program further supports the district court's conclusion that DOJ has violated the APA. Finally, in attempting to deny the Byrne JAG funds that Congress has duly appropriated to the States for local law-enforcement needs, DOJ has intruded upon Congress's spending power and accordingly violated the Constitution's separation of powers.

17

# ARGUMENT

# POINT I

### THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE CHALLENGED CONDITIONS ARE UNLAWFUL

## A. The Byrne JAG Statute Does Not Permit the U.S. Attorney General to Impose New Eligibility Requirements on Byrne JAG Recipients.

The Byrne JAG statute contains no express provision authorizing DOJ to impose eligibility requirements of its own choosing that are unrelated to federal grantmaking or to the Byrne JAG program requirements prescribed by Congress. The statute instead provides that "the Attorney General *shall . . .* allocate" grant money based on the statutory formula, 34 U.S.C. § 10156(a)(1) (emphasis added), and that applicants may "request" appropriated grant funds by submitting an application and certifications "in such form as the Attorney General may require," *id.* § 10153(a). Consistent with the nature of Byrne JAG as a formula grant, the statutory formula is determinative of a grantee's eligibility to receive grant funds.[6] *See City of Los Angeles v. McLaughlin,*

---

[6] *See* Paul G. Dembling & Malcolm S. Mason, *Essentials of Grant Law Practice* § 5.03(c), at 34-35 (1991), ECF No. 58-36 (the General Accounting Office defines "formula grant" as "grants in which a structured

865 F.2d 1084, 1088 (9th Cir. 1989).

Other provisions of the Byrne JAG statute confirm that Congress intended to constrain DOJ's ability to deviate from the statutory formula when disbursing grants. For example, 34 U.S.C. § 10157(b) permits DOJ to reserve up to five percent of appropriated funds and reallocate them to a State or locality if DOJ determines that reallocation is necessary to combat "extraordinary increases in crime" or to "mitigate significant programmatic harm resulting from" the formula. By expressly restricting DOJ's authority to redirect Byrne JAG funds to very limited and specifically enumerated instances—none of which are implicated here—Congress made clear that DOJ must otherwise abide by the statutory formula in distributing grant monies. *See, e.g.*, *Department of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015) (provision of express authority in one statutory section implies intent to exclude such authority elsewhere); *Philadelphia*, 916 F.3d at 286-87; *Chicago*, 888 F.3d at 286-87.

The structure of title 34, chapter 101 of the United States Code

---

mathematical statement and data elements, such a statistical data, are used to (1) allocate funds to eligible recipients, or (2) determine a potential grant recipient's eligibility to receive funds, or both").

19

underscores these limits on DOJ's authority. Byrne JAG is located in part A of subchapter V of Chapter 101, which is entitled "Edward Byrne Memorial Justice Assistance Grant Program." *See* 34 U.S.C. §§ 10151-58. In contrast, Part B, entitled "Discretionary Grants," authorizes DOJ to issue grants to support projects similar to those supported by Byrne JAG but at DOJ's discretion. *See id.* §§ 10171-91.

Where Congress has sought to condition Byrne JAG funds upon compliance with other legislative aims, it has done so explicitly by statute—and in such cases has authorized only modest withholdings. *See Philadelphia*, 916 F.3d at 286 (discussing other specific statutory provisions which permit DOJ to withhold Byrne JAG funds). For example, a State that fails to "substantially implement" relevant provisions of the Sex Offender Registration and Notification Act "shall not receive 10 percent of the funds" it would otherwise receive under Byrne JAG. *See* 34 U.S.C. § 20927(a).[7] Critically, as the Third Circuit has observed, none of those provisions grant DOJ "the power to withhold *all*

---

[7] *See also* 34 U.S.C. § 30307(e)(2) (providing a five-percent penalty for noncompliance with the Prison Rape Elimination Act); 42 U.S.C. § 3756(f) (2000) (providing a ten-percent penalty for not testing sex offenders for HIV at victims' request).

of a grantee's funds for *any* reason [it] chooses" as DOJ is attempting to do here. *Philadelphia*, 916 F.3d at 286; *see Chicago*, 888 F.3d at 286-87.

The Byrne JAG statute's legislative history leads to the same conclusion. When Congress created the first predecessor to the Byrne JAG program in 1968, it also enacted a statute to ensure that grants under that predecessor program would not become a means for federal agencies to control, direct, or supervise state and local law enforcement. See *infra* at 46-49; 34 U.S.C. § 10228(a). In addition, when enacting Byrne JAG—the latest version of the 1968 program (see *supra* at 4-5)—Congress reaffirmed its aim to "give State and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89.

This Court should reject DOJ's attempt to recast the Byrne JAG statute as a vehicle for advancing federal immigration enforcement. *See* Br. for Appellant (Br.) at 1-3. As the text and history of the Byrne JAG statute confirm, the Byrne JAG program has nothing to do with federal immigration laws.

Consistent with the broad purposes expressly permitted by the Byrne JAG statute, *see* 34 U.S.C. § 10152(a)(1), the States have used

their Byrne JAG funds for a wide array of diverse programs unrelated to immigration policy or criminal detention, including those focused on community outreach, substance abuse intervention, victim advocacy, and mental health treatment. See *supra* at 7-8.

In addition, since the 1990s, Congress has repeatedly considered and rejected legislation that would withhold Byrne JAG funding as a penalty for noncooperation with federal immigration law. For example, the Senate version of the 1994 Crime Bill included such a provision, but it was eliminated in conference. *See* Violent Crime Control and Law Enforcement Act of 1994 H.R. 3355, 103d Cong. § 5119 (version dated Nov. 19, 1993); H.R. Rep. No. 103-694, at 424 (1994) (Conf. Report). More recent attempts to impose similar restrictions have uniformly failed[8]—a factor that further counsels against DOJ's claimed authority in this case. *See Chicago*, 888 F.3d at 277-78; *City and County of San Francisco v.*

---

[8] *See, e.g.*, Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. § 4 (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. § 4 (2016); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3 (2015); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. § 2 (2015); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. § 3(a) (2015); Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2 (2015).

*Trump*, 897 F.3d 1225, 1234 & n.4 (9th Cir. 2018). In light of Congress's repeated failure to enact legislation imposing similar immigration-related conditions on grants, DOJ's current attempt to do so is suspect. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000).

In sum, as the Seventh Circuit and the Third Circuit have both observed, no provision of the Byrne JAG statute "grant[s] the Attorney General the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for the failure to comply with those conditions." *Chicago*, 888 F.3d at 284; *see Philadelphia*, 916 F.3d at 287-88; *see also, e.g., California Actions*, 349 F. Supp. 3d at 945-47. The district court did not err when it reached this same conclusion here.

## B. The Challenged Conditions Are Not Authorized by 34 U.S.C. § 10102(a)(6).

DOJ also misplaces its reliance (Br. at 17, 20, 22-23) on 34 U.S.C. § 10102(a)(6). That provision authorizes the Assistant Attorney General who is the head of OJP to "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special

23

conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6).

As the full text of § 10102(a)(6) shows, the "special conditions" and "priority purposes" language that DOJ relies upon (Br. at 20) is simply an elaboration of the types of powers that the Assistant Attorney General for OJP may exercise—not a "stand-alone grant of authority" for the challenged conditions. (JA 13-14 (quotation marks omitted).) Every other court that has passed on the question has reached the same conclusion. *See, e.g.*, *Philadelphia*, 916 F.3d at 287-88; *Chicago*, 888 F.3d at 286-87; *California Actions*, 349 F. Supp. 3d at 947-48. Put another way, the language of § 10102(a)(6) simply clarifies that the U.S. Attorney General may delegate the powers described therein to the Assistant Attorney General for OJP, "notwithstanding" the U.S. Attorney General's "final authority over all functions, including any grants" made by "the Office of Justice Programs and the component organizations of that Office," *see* 34 U.S.C. § 10110(2).

As the Seventh and Third Circuits have concluded, Congress's placement of the "special conditions" and "priority purposes" clauses—at the end of the statute, after a list of various ministerial reporting,

24

coordination, and publication duties of the Assistant Attorney General relating to criminal justice programs—counsels against construing those terms as conferring on DOJ the "sweeping power" that it claims here. *See Chicago*, 888 F.3d at 285; *Philadelphia*, 916 F.3d at 288. Congress could not have intended the language in a provision enumerating the "otherwise-ministerial powers" of the Assistant Attorney General for OJP to confer the authority to "abrogate the entire distribution scheme and deny all funds to states and localities . . . based on the Assistant Attorney General's decision to impose his or her own conditions." *Chicago*, 888 F.3d at 286-87.

In any event, none of the challenged conditions are "special conditions" within the meaning of § 10102(a)(6). "Special conditions" is a long-established term of art in the federal grant-making context that refers only to those grant conditions applying to "high-risk grantees"—as distinguished from conditions that are generally applicable to all grants under a particular grant program. *See City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 617 (E.D. Pa. 2017) (quotation marks omitted), *appeal dismissed*, 2018 WL 3475491 (3d Cir. 2018); *see also Chicago*, 888 F.3d at 285 n.2. The federal Office of Management and Budget's (OMB) uniform administrative rules governing federal grants to States

and localities dating back to the 1980s have consistently used "special conditions" in this same way. *See, e.g.*, 53 Fed. Reg. 8,034, 8,090 (Mar. 11, 1988). Other authorities on federal grants similarly confirm this well-known understanding of the term.[9]

When Congress amended § 10102(a)(6) in 2006 to add the "special conditions" language, DOJ's own regulations defined the term as a condition that is imposed to address financial or performance concerns specific to a particular applicant. *See* 28 C.F.R. § 66.12 (2006).[10] Such a

---

[9] Dembling & Mason, *supra* n.6, § 11.01, at 107 ("special conditions" are those tailored to specific problems posed by particular grantees); Malcolm S. Mason, *Monitoring of Grantee Performance*, *in Federal Grant Law* 79, 86 (Malcolm S. Mason ed., 1982) ("special conditions" are those applied to "high-risk grantees") (Addendum 1).

[10] 28 C.F.R. § 66.12 (2006) provided, in relevant part:

(a) A grantee or subgrantee may be considered "high risk" if an awarding agency determines that a grantee or subgrantee: (1) Has a history of unsatisfactory performance, or (2) Is not financially stable, or . . . (5) Is otherwise not responsible; and if the awarding agency determines that an award will be made, special conditions and/or restrictions shall correspond to the high risk condition and shall be included in the award.

(b) Special conditions or restrictions may include: (1) Payment on a reimbursement basis; (2) Withholding authority to proceed to the next phase until receipt of evidence of acceptable performance within a given funding period; (3) Requiring additional, more detailed financial reports; (4) Additional project monitoring; (5) Requiring the grantee

condition might include, for example, a requirement that a financially unstable grantee provide a more detailed financial report, or be subject to additional monitoring. *Id.* § 66.12(b)(3)-(4). Under established approaches to statutory construction, this history and context offers strong support for reading § 10102(a)(6) to incorporate the long-established and well-understood regulatory definition of "special condition." Courts "assume that when a statute uses [a term of art], Congress intended it to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991).

DOJ's own regulations thus underscore that permissible special conditions or restrictions must be tailored to the specific risks posed by a particular grantee. *See* 28 C.F.R. § 66.12(a)(5) (2006) (restrictions imposed "shall correspond to the high risk condition"). Indeed, OJP itself has used

---

or subgrantee to obtain technical or management assistance; or (6) Establishing additional prior approvals.

In 2014, DOJ repealed § 66.12 and adopted a virtually identical substitute promulgated by OMB in 2 C.F.R. part 200. *See* 79 Fed. Reg. 75,872, 76,081 (Dec. 19, 2014). That OMB regulation—which is still in effect today and governs all OJP grants including Byrne JAG—uses the phrase "specific conditions" instead of "special conditions," but the regulations are otherwise substantively the same. *See* 2 C.F.R. § 200.207.

27

"special conditions" in the FY 2018 Byrne JAG Solicitation in this very way—that is, to refer to conditions that may be applied to a "high-risk" State based on OJP's "pre-award risk assessment" of the State's "financial management and internal control system."[11]

The challenged conditions impose new eligibility requirements having nothing to do with remediating a grantee's specific performance or financial risk. They are thus fundamentally different in nature and kind from the types of special conditions expressly identified as permissible under DOJ's regulations. *See id.* § 66.12(b)(1)-(6) (describing permissible special conditions); *see also* 2 C.F.R. § 200.207. Requiring state and local governments to affirmatively assist in federal immigration efforts does not address any grant performance concerns; Congress created Byrne JAG to establish a reliable funding stream that States and localities could use in accordance with state and local—and

---

[11] *FY 2018 State Solicitation*, *supra* n.4, at 26 ("[A] pre-award risk assessment that indicates that [a Byrne JAG] applicant poses a higher risk to OJP [based on financial management and internal controls disclosures] may . . . result in additional reporting requirements, monitoring, *special conditions*, withholding of award funds, or other additional award requirements.") (emphasis added).

not federal—law-enforcement priorities. The challenged conditions also cannot be applied as grantee-specific "special conditions" pursuant to § 10102(a)(6) because DOJ does not contend that any of the States are "high-risk" in a way that warrants imposition of the challenged conditions.[12]

DOJ is not aided by its claimed prior reliance on § 10102(a)(6) (Br. at 20-21) when requiring all grantees to comply with certain other generally-applicable conditions. Those prior conditions are distinguishable from the conditions challenged here because the prior conditions are authorized by provisions of the Byrne JAG statute or by other federal authorities governing federal grants or grantmaking.[13] And as the Third

---

[12] As noted above (*supra* n.10), the factors warranting treatment of a grantee as "high-risk" and thus properly subject to a "special condition" include financial instability and past "unsatisfactory" grant performance— among other things. 28 C.F.R. § 66.12(a)(1)-(5) (2006); *see also* 2 C.F.R. § 200.207(a).

[13] For example, conditions restricting the purchase of certain types of equipment (Br. at 20; JA 287 (¶ 45)) are expressly set forth in the Byrne JAG statute. *See* 34 U.S.C. § 10152(d) (prohibited uses of Byrne JAG funds). And the condition requiring protections for human research subjects (Br. at 20; JA 283 (¶ 31)) is authorized by 28 C.F.R. § 46.103(a), which provides that all institutions "supported by a federal department or agency" must comply with federal rules concerning human research. *See also* Suppl. Decl. of Nancy M. Trasande, Ex. 52, Special Conditions

29

Circuit has observed, the prior conditions relied upon by DOJ differ from the challenged conditions in another respect too: none of the other conditions are "blanket requirements with which the grantee must comply under all circumstances"; instead, those conditions apply only if the grantee chooses to use the grant funds in a particular manner. *See Philadelphia*, 916 F.3d at 290. (*See also* JA 190-192 (Byrne JAG solicitation setting forth use-specific conditions relating to, *e.g.*, body armor, body-worn cameras, DNA testing).) DOJ's past practices thus do not support its claim (Br. at 20, 22-25) that § 10102(a)(6) gives it broad authority to withhold Byrne JAG funds altogether based on conditions of its own choosing.

Nor can DOJ justify the challenged conditions as "priority purposes" authorized by § 10102(a)(6). The broad construction of § 10102(a)(6) urged by DOJ (Br. at 24-25)—under which DOJ may withhold an entire Byrne JAG grant from a State entirely based on DOJ's

---

Spreadsheet, ECF No. 93-10 (describing the sources of authority for each of the prior conditions); *Philadelphia*, 916 F.3d at 290 n.12 (noting Philadelphia had set forth the statutory authority for each of the prior conditions imposed by DOJ, and DOJ did "not take issue with the City's account").

own determination of funding priorities—is fundamentally at odds with Congress's decision to constitute the Byrne JAG program as a mandatory formula grant. *See Chicago*, 888 F.3d at 285; *Philadelphia*, 916 F.3d at 287-88. As DOJ's own practices show, the "priority purposes" language in § 10102(a)(6) is more appropriately interpreted as authorizing DOJ to suggest that Byrne JAG recipients use the funds in certain "areas of emphasis." (*See* JA 194.) The FY 2017 Byrne JAG solicitation, for example, "*encourages* each State recipient of an FY 2017 award to join [DOJ] in addressing" certain law enforcement areas of priority. (JA 194-195 (emphasis added).)

For these reasons, the district court correctly rejected DOJ's argument that § 10102(a)(6) authorizes it to withhold Byrne JAG funds upon a grantee's non-compliance with conditions requiring that States and localities affirmatively assist in federal immigration enforcement. The Seventh Circuit and the Third Circuit—among other courts—have reached this same conclusion. *See, e.g.*, *Philadelphia*, 916 F.3d at 287-88; *Chicago*, 888 F.3d at 284-86; *California Actions*, 349 F. Supp. 3d at 947-48.

31

**C.    The New Requirements Are Not Authorized by
34 U.S.C. § 10153.**

Section 10153 is an administrative provision that authorizes the Attorney General to promulgate the form of Byrne JAG applications and certifications. The statute also requires an applicant for Byrne JAG funds to "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," 34 U.S.C. § 10153(a)(4), and to certify that "there has been appropriate coordination with affected agencies," *id.* § 10153(a)(5)(c). There is no basis to DOJ's assertion (Br. at 22) that these provisions in § 10153(a) authorize the Notice and Access conditions.

Congress identified eight "broad purposes" for which States and localities could use Byrne JAG funds. H.R. Rep. No. 109-233, at 89. None of those statutorily identified purposes pertains to federal immigration law. *See* 34 U.S.C. § 10152(a)(1). Accordingly, the States have historically used Byrne JAG grants to fund local programs that have nothing to do with immigration law or criminal detention. For example, New York has used Byrne JAG funds to combat gun violence, enhance forensic laboratories, and support prosecution and defense services. And

32

Massachusetts uses the Byrne JAG award to fund local task efforts focused on crime deterrence and drug diversion.

Notifying federal officials about an offender's release date from state and local custody and affording federal officials access to state and local correctional facilities in no way constitutes "reasonable information" about such programs or "appropriate coordination with affected agencies" within the meaning of § 10153(a), as DOJ claims (Br. at 22 (quotation marks omitted)). *See, e.g. Philadelphia*, 916 F.3d at 285. Nothing in the text or history of § 10153 supports DOJ's suggestion (Br. at 21-22) that § 10153's ministerial provisions were intended to address the impacts of state and local criminal justice activities on federal immigration enforcement.

DOJ likewise misplaces its reliance (*id.* at 26-27) on 34 U.S.C. § 10153(a)(5)(D), which requires an applicant for Byrne JAG funds to certify, "in a form acceptable to the Attorney General," that the grantee "will comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). Contrary to DOJ's assertions, this provision does not authorize DOJ's new requirement that Byrne JAG grantees certify their and their subgrantees' compliance with 8 U.S.C.

§ 1373—a statute providing that state and local governments and officials "may not prohibit, or in any way restrict, any government entity or official from" communicating with federal immigration officials "regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a).

As the district court explained, the Byrne JAG statute's grant of authority to the Attorney General to prescribe the *form* of Byrne JAG applications and certifications, *see* 34 U.S.C. § 10153(a), cannot reasonably be construed as authorization to dictate *substantive* eligibility requirements beyond those set forth by Congress. (*See* JA 17.) *See also California Actions*, 349 F. Supp. 3d at 955. And accepting DOJ's argument that the term "all other applicable Federal laws" should be construed to include any and all federal statutes of DOJ's choosing (Br. at 26-27) would impermissibly convert the Byrne JAG program into a discretionary grant—a result that "would destabilize the formula nature of the grant."[14] *See Philadelphia*, 916 F.3d at 290; *Chicago*, 888 F.3d at 286-87.

---

[14] DOJ's interpretation is not entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) because the question of whether § 1373 is an "applicable Federal law" is one of pure statutory construction. *See Iavorski v. INS*, 232 F.3d

The structure and text of § 10153(a)(5)(D) confirms the district court's conclusion that "applicable Federal laws" includes only those statutes that apply to the grant and grantmaking. (JA 19.) *See Philadelphia*, 916 F.3d at 289-90 ("applicable Federal laws" means "laws that apply to operations relating to the grant" (quotation marks omitted)); *California Actions*, 349 F. Supp. 3d at 954 (same). As the Third Circuit has observed, the contrary argument proffered by DOJ—that "applicable Federal laws" means every law that could conceivably apply to States and localities (Br. at 26)—would render the word "applicable" entirely superfluous since "Congress could have simply written that a grant applicant must certify compliance with all other Federal laws." *Philadelphia*, 916 F.3d at 289; *see California Actions*, 349 F. Supp. 2d at 954. The fact that the neighboring provisions of § 10153(a)(5) all generally concern "requirements pertaining to the grant and the application" (JA 18)—as opposed to requirements applying more generally to the

---

124, 133 (2d Cir. 2000). In any event, DOJ has never invoked the *Chevron* doctrine in this litigation, and has thus forfeited any claim to *Chevron* deference, *see Neustar, Inc. v. Federal Commc'ns Comm'n*, 857 F.3d 886, 894 (D.C. Cir. 2017) (*Chevron* deference is not jurisdictional and may be forfeited if not raised).

applicant—further counsels against the broad construction advanced by DOJ here. *See Philadelphia*, 916 F.3d at 289-90 (noting that the provisions surrounding the "applicable Federal laws" clause "all relate to the programs that will be funded under the grant").

DOJ's own practices in the certification context confirm that "applicable Federal laws" refers only to the body of laws that by their express text apply to federal grants: that is, those federal laws "*applicable to the award.*" (*See* JA 228 (§ 3(a)) (OJP's Certified Standard Assurances Form) (emphasis added).)[15] Section 1373 is not such an "applicable" law because it does not reference any limits on the use of federal funds, and is textually unconnected to the Byrne JAG program as well as to federal grantmaking in general. *See Philadelphia*, 916 F.3d at 289-91; *California Actions*, 349 F. Supp. 3d at 954. Nor is § 1373 limited to information-sharing about individuals who are in state and local "criminal custody," as DOJ contends (Br. at 31-32). To the contrary, the

---

[15] *See Philadelphia*, 916 F.3d at 290 (noting that "the Justice Department's historical practice" with respect to the certification requirement "does not comport with the broad interpretation that it urges in this case").

restrictions that § 1373 imposes on state and local governments cover immigration information about "any individual" that state and local authorities have acquired for whatever reason, regardless of whether the individual is suspected of any crimes.[16] *See* 8 U.S.C. § 1373(a), (b).

Section 10153's legislative history further supports the district court's conclusion that this provision does not cover non-grantmaking statutes like § 1373. The relevant language was first enacted in the Justice System Improvement Act of 1979, which reauthorized a predecessor to Byrne JAG. *See* Pub. L. No. 96-157, § 2, secs. 401-05, 93 Stat. 1167, 1179-92 (amending the 1968 block grant legislation).[17] At that time, DOJ understood the term "applicable Federal laws" to refer to statutes that

---

[16] State and local officials may learn of the immigration or citizenship status of crime victims in the course of criminal investigations. Additionally, through the routine provision of governmental services, state and local officials may come to possess citizenship or immigration status information about individuals in a variety of contexts unrelated to law enforcement, such as education and benefits administration.

[17] The relevant language in the 1979 Act was codified in 42 U.S.C. § 3743. Like 34 U.S.C. § 10153, Section 3743 codified grant application requirements, including that an applicant certify it "will comply with all provisions of this title and *all other applicable Federal laws*." Pub. L. No. 96-157, § 2, sec. 403(a)(8), 93 Stat. at 1188, ECF No. 58-34 (emphasis added).

govern the provision of federal financial assistance.[18] For example, DOJ's Law Enforcement Assistance Administration (LEAA)—the agency responsible for administering law-enforcement grants—issued manuals providing "guidance to grantees on their responsibilities of [sic] *applicable federal laws and regulation*s" (emphasis added).[19] A 1978 manual lists the laws DOJ understood to be applicable to federal law-enforcement grants, and the list contains only statutes governing federal grant-making.[20]

Absent some contrary indication, when Congress incorporates a term of art into a statute, courts "assume" that "Congress intended" the language "to have its established meaning." *McDermott*, 498 U.S. at 342. The inference is particularly strong here because Congress knew of DOJ's

---

[18] *See, e.g.*, DOJ, Law Enforcement Assistance Admin. (LEAA), *General Briefing* 6 (1977), ECF Nos. 58-21 to 58-24 (identifying twenty-three laws "applicable" to DOJ grants, and providing the National Environmental Protection Act and civil rights statutes as examples).

[19] *Amendments to Title I (LEAA) of the Omnibus Crime Control and Safe Streets Act: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Judiciary Comm.*, 94th Cong. 404 (1976), ECF No. 58-20 (statement of Richard Velde, LEAA Administrator).

[20] DOJ, LEAA, *Guideline Manual: Guide for Discretionary Grant Programs* (1978), ECF Nos. 58-29 to 58-31.

understanding. In 1977, DOJ prepared a report identifying the laws that DOJ deemed applicable to law-enforcement block grants: approximately twenty federal laws that, by their terms, governed federal grant-making.[21] The report was distributed to every Member of Congress and every governor—among others—and was subject to public comment and hearings.[22]

DOJ's construction of § 10153(a)(5)(D) also runs contrary to one of the main goals of the 1979 Act that introduced the relevant language: to reduce administrative burdens associated with DOJ grants.[23] One of the

---

[21] *See* DOJ, *Restructuring the Justice Department's Program of Assistance to State and Local Governments for Crime Control and Criminal Justice System Improvement* 8-9 (June 23, 1977) ("Restructuring Report"), ECF No. 58-25.

[22] *See Restructuring the Law Enforcement Assistance Administration: Hearings Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 95th Cong. 3, 9 (1977), ECF No. 58-26.

[23] *See, e.g.*, *Federal Assistance to State and Local Criminal Justice Agencies: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Comm. on the Judiciary*, 95th Cong. 383 (1978), ECF No. 58-28 (stating that the bill was "designed" to "simplify[] the grant process"); Office of Representative Peter W. Rodino, Press Release, *Committee Approves LEAA Reorganization* 1 (May 10, 1979), ECF No. 58-33 (noting the 1979 Act was "designed to drastically reduce the red tape which has plagued the process of getting federal assistance to states and local governments" (quotation marks omitted)).

central concerns highlighted in DOJ's 1977 report was that the then-body of federal laws applicable to law-enforcement block grants—the approximately twenty statutes scattered across the United States Code that applied to federal grantmaking—imposed excessive burdens on grantees.[24] It is unlikely that the relevant language would have been supported by DOJ and enacted by Congress if either entity believed it could be used to drastically increase the compliance burdens on States and localities, as DOJ is currently attempting to do.

## D. The § 1373 Requirement Is Also Unlawful Because § 1373 Violates the Tenth Amendment.

The § 1373 requirement is unlawful for another reason: the underlying statute, 8 U.S.C. § 1373, violates the Tenth Amendment's anti-commandeering proscription under the principles recognized in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478 (2018). In *Murphy*, the Supreme Court struck down as unconstitutional

---

[24] *See Restructuring Report*, *supra* n.21, at 9 ("Although each of these acts addresses an important national priority, the cumulative effect of their reporting and administrative requirements is staggering by the time they are passed on to a state agency administering the LEAA block grant.").

a federal statute that prohibited, among other things, "a State or any of its subdivisions" from enacting a particular type of law. *Id.* at 1470, 1478. The district court here correctly determined that the central holding of *Murphy*—that the Tenth Amendment does not permit Congress to "issue direct orders to state legislatures," regardless of the content of those directives, *id.* at 1478—compels the conclusion that § 1373 is unconstitutional. (*See* JA 20-29.)

Section 1373(a) provides that a "State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from" federal immigration officials information "regarding the citizenship or immigration status, lawful or unlawful, of any individual." Section 1373(b) similarly prohibits a "person or agency" from restricting state and local governments and officials from maintaining or communicating information concerning the immigration status of any individual.

This statutory language runs afoul of the Tenth Amendment (*see* JA 25) because it "does just what *Murphy* proscribes: it tells States they may not prohibit (i.e., through legislation) the sharing of information regarding immigration status" with the federal government, *United States*

41

*v. California*, 314 F. Supp. 3d 1077, 1099 (E.D. Cal. 2018).[25] Section 1373 is not "limited to information sharing," as DOJ suggests (Br. at 37); instead, that statute broadly prohibits state and local governments from being able to adopt *any* rules governing their employees' communications of immigration-status information to federal officials. As this Court has previously recognized, § 1373's "undeniable" interference with the ability of state and local governments to control how their employees handle sensitive information acquired in the course of official duties may impede such governments' collection of this information in the first place—thereby undermining "the performance of a wide variety of state and local governmental functions." *See City of New York v. United States*, 179 F.3d 29, 36 (2d Cir. 1999).

Contrary to DOJ's contention (Br. at 33), *City of New York* does not compel rejection of the States' Tenth Amendment claims here. In *City of*

---

[25] *See also California Actions*, 349 F. Supp. 3d at 949-53; *Chicago*, 321 F. Supp. 3d at 869 (concluding that § 1373 "constrains local rule-making by precluding [local] lawmakers from passing laws . . . that institute locally-preferred policies which run counter to Section 1373."); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 329-30 (E.D. Pa.), *aff'd in part, vacated in part on unrelated grounds by* 916 F.3d 276 (3d Cir. 2018).

*New York*, a prior panel of this Court upheld § 1373 against a *facial* Tenth Amendment challenge brought by the City of New York,[26] relying on the perceived distinction "between invalid federal measures that seek to impress state and local governments into the administration of federal programs and valid federal measures that prohibit states from compelling passive resistance to particular federal programs." 179 F.3d at 35. The Supreme Court has since rejected this distinction, however, explaining that the Tenth Amendment's anti-commandeering proscription applies equally to laws which command "'affirmative' action" on the part of state legislatures and those which impose prohibitions. *Murphy*, 138 S. Ct. at 1478. As the *Murphy* Court explained, "[i]n either event, state legislatures are put under the direct control of Congress." *Id. City of New York*'s holding thus does not control the outcome of the States' Tenth Amendment claim here.[27] *See Adams v. Zasnel*, 619 F.3d 156, 168 (2d Cir. 2010) (prior precedent may be overruled by a panel where an "intervening

---

[26] In *City of New York*, § 1373 was referred to as § 642 of the Immigration Reform Act. *See* 179 F.3d at 32.

[27] *See also Chicago*, 321 F. Supp. 3d at 873 (observing that "*Murphy's* holding deprives *City of New York* of its central support").

Supreme Court decision . . . casts doubt on [that] controlling precedent" (quotation marks omitted)).

DOJ is further mistaken in its suggestion that § 1373 merely prohibits "state and local laws that obstruct federal laws regulating private actors," and therefore should be analyzed under preemption principles rather than under the Tenth Amendment. *See* Br. at 33 (quotation marks and alterations omitted). Preemption provisions displace conflicting state and local laws by operation of the Supremacy Clause, but they do not override the Tenth Amendment's prohibitions against Congress directing the actions of state legislatures. *See Murphy*, 138 S. Ct. at 1478.

In any event, § 1373 is not a preemption provision because there is no underlying federal mandate that private actors affirmatively share immigration-related information with federal officials to begin with. Accordingly, state and local government rules concerning how their employees may communicate with federal officials about immigration-status information do not conflict with any federal scheme.

As the Supreme Court clarified in *Murphy*, a federal statute operates to preempt state law only where the federal statute can be

44

reasonably understood to "regulate[] the conduct of private actors, not the States." 138 S. Ct. at 1481. Here, the plain language of § 1373 makes clear that § 1373 regulates state and local government actors, not private citizens. *See* 8 U.S.C. § 1373(a); *California Actions*, 349 F. Supp. 3d at 950 (§ 1373 "does not regulate private actors"). Indeed, DOJ relies on the fact that § 1373 regulates States and localities as an essential part of its argument that § 1373 is an "applicable Federal law" under § 10153(a)(5)(D). *See* Br. at 26; Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Partial Summ. J. at 20, ECF No. 89.

DOJ further misses the mark in insisting that § 1373 may be applied as a Byrne JAG grant condition even if § 1373 violates the Tenth Amendment. *See* Br. at 28-29 (quoting *South Dakota v. Dole*, 483 U.S. 203, 210 (1987)). To be sure, *Congress* may use its Spending Power to impose a wider range of conditions on federal grants than the Tenth Amendment permits to be imposed on States directly. *See Dole*, 483 U.S. at 210. But that proposition does not help *DOJ* here because *Congress* never authorized DOJ to impose § 1373 as a condition of Byrne JAG eligibility under § 10153(a)(5)(D) in the first place. See *supra* at 18-40.

45

**E.    The Challenged Conditions Are Inconsistent with 34 U.S.C. § 10228(a) Because They Seek to Direct and Control the Actions of State and Local Law Enforcement.**

All of the challenged conditions are also invalid under a separate statutory provision—codified in the same chapter of the United States Code as the Byrne JAG statute—which provides that "*[n]othing in this chapter* or *any* other Act shall be construed to authorize *any* department, agency, officer, or employee of the United States to exercise *any* direction, supervision, or control over *any* police force or *any* other criminal justice agency of *any* State or *any* political subdivision thereof," 34 U.S.C. § 10228(a) (emphasis added). Section 10228(a) was enacted in 1968, at the same time when Congress created the first law-enforcement block grant program, to prohibit precisely the type of executive-branch action challenged in this case: the use of federal law-enforcement grants to exert "direction, supervision, or control" over state and local police forces or law-enforcement agencies. *See* Pub. L. No. 90-351, § 518(a), 82 Stat. at 208. That provision's repeated use of "any" shows Congress's intent to speak broadly. *See Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 218-19 (2008). Applied in the present context, § 10228(a) prohibits all three conditions.

46

The legislative history of § 10228(a) confirms this result. Opponents of the 1968 block-grant legislation expressed concerns that the U.S. Attorney General would use law-enforcement grants to coerce States and localities into adopting federal law-enforcement priorities.[28] Supporters responded that § 10228, which was pending before Congress as part of the 1968 Act, would prohibit such control. U.S. Attorney General Ramsey Clark testified it would violate both "the mandate and spirit" of § 10228(a) to withhold funds whenever police departments were not run "the way the Attorney General says they must" be, and that § 10228(a) prevented DOJ from imposing extra-statutory conditions on law-enforcement grants.[29]

Although arising in a different context, the Supreme Court's anti-commandeering jurisprudence makes clear that compelling state law-

---

[28] *See, e.g.*, S. Rep. No. 90-1097, at 230 (expressing concern that the Act would enable the U.S. Attorney General to "become the director of state and local law enforcement"). *See generally* John K. Hudzik et al., *Federal Aid to Criminal Justice: Rhetoric, Results, Lessons* 15, 23-26 (1984), ECF No. 58-35.

[29] *Controlling Crime Through More Effective Law Enforcement: Hearings Before the Subcomm. on Criminal Laws and Procedure of the S. Comm. on the Judiciary*, 90th Cong. 100, 384, 497 (1967), ECF No. 58-18.

enforcement officers to assist in "the administration of a federally enacted regulatory scheme" constitutes impermissible "direction" or "control" and violates the Constitution's anti-commandeering prohibitions. *See Printz v. United States*, 521 U.S. 898, 904, 930, 935 (1997).[30] The § 1373 condition requiring grantees to report violations of § 1373 by subgrantees effectively turns States and localities into an enforcement arm of federal immigration authorities. *See also California Actions*, 349 F. Supp. 3d at 952 (finding that § 1373 "shifts a portion of immigration enforcement costs onto the States").

The burdens imposed by the § 1373 certification requirement are substantial. Among other things, Byrne JAG grantees must obtain § 1373 certifications from each of their subgrantees, and continuously monitor such subgrantees for compliance with § 1373 for the duration for the Byrne JAG award. These burdens are particularly onerous for those of the States with large numbers of subgrantees. For example, in 2016,

---

[30] The legislation at issue in *Printz*, the Brady Act, violated these prohibitions by requiring local officers to run background checks on handgun purchasers, and requiring state officers "to accept" forms from gun dealers. 521 U.S. at 904-05, 934.

New York disbursed Byrne JAG funds to 116 subgrantees, including many towns, counties, and local law-enforcement and social services agencies.[31] Similarly, in FY 2014, Connecticut disbursed Byrne JAG funds to several state agencies and twenty-eight local jurisdictions, and Washington passed through its grant funds to approximately eighteen subgrantees across the state.[32]

In sum, all of the challenged conditions are unlawful under § 10228(a) because they require state officials to (1) administer federal immigration policy through mandated responses to federal requests for information; (2) devote staff, resources, and real property to facilitate federal agents' access to aliens in correctional facilities; and (3) monitor subgrantees continuously for compliance with § 1373. *See Printz*, 521 U.S. at 904. And as the Third Circuit found, the § 1373 requirement may further violate § 10228(a) by authorizing DOJ "to direct, supervise, or control" local police communications with federal immigration officials. *See Philadelphia*, 916 F.3d at 291.

---

[31] *See* Decl. of Michael Charles Green ¶ 19, ECF No. 59.

[32] Lawlor Decl. ¶ 7 (Connecticut); Decl. of Diane Klonz ¶ 4, ECF No. 66 (Washington).

49

## POINT II

### THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON THE STATES' ADMINISTRATIVE PROCEDURE ACT (APA) AND SEPARATION-OF-POWERS CLAIMS

### A. DOJ's Unauthorized and Arbitrary and Capricious Actions Violates the APA.

The district court correctly determined that no statute authorizes DOJ to unilaterally impose the challenged conditions on Byrne JAG grantees. (JA 12-19.) *See Philadelphia*, 916 F.3d at 284-91; *Chicago*, 888 F.3d at 283-87; *California Actions*, 349 F. Supp. 3d at 944-48, 955. The States thus satisfied their burden on their APA claim. By taking actions that it was not authorized to undertake, DOJ necessarily acted "in excess of statutory . . . authority" in violation of the APA. *See* 5 U.S.C. § 706(2)(C); *Natural Res. Def. Council v. National Highway Traffic Safety Admin.*, 894 F.3d 95, 107-108 (2d Cir. 2018).

Because DOJ has no discretion to deviate from the mandatory statutory formula for the allocation and disbursement of Byrne JAG funds, there is no basis for DOJ's suggestion (Br. at 38) that its actions are unreviewable under the APA. DOJ's cited case of *Lincoln v. Vigil* (*id.* at 39) is simply inapposite. That decision held that "where Congress merely appropriates lump-sum amounts without statutorily restricting

50

what can be done with those funds," an agency's decision about how to expend those funds is not subject to APA review, but rather is a matter "committed to agency discretion by law." *See Vigil*, 508 U.S. 182, 192-93 (1993) (quotation marks omitted).

Here, the Byrne JAG funds at issue were not appropriated to DOJ but to States and localities, and DOJ was obligated to administer the grant under the terms set forth by Congress. Nothing in *Vigil* stands for the proposition that DOJ has discretion to disregard Congress's directive that DOJ "shall" disburse the Byrne JAG funds in accordance with the mandatory statutory formula, *see* 34 U.S.C. § 10156(a)(1), by unilaterally imposing new funding conditions unintended by Congress.

The APA requires that where an agency changes course from its longstanding practice, it must at least acknowledge that it *is* changing course, and provide some reasoned basis for departing from past established practice. *Federal Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This is especially so when the agency's past practice has engendered reliance by affected parties—as is the case here. *See id.* Since the program's inception in 2006, the States have relied on the Byrne JAG grant as a steady source of federal funding for local

law enforcement efforts, and they have used Byrne JAG monies to fund important law enforcement programs tailored to local needs. *See supra* at 7-8.

DOJ has administered the Byrne JAG grant for more than a decade, and never previously sought to withhold all funding from a Byrne JAG recipient based on extra-statutory requirements having nothing to with the Byrne JAG program or with grantmaking in general. To the contrary, DOJ's own stated view in the past was that it lacked the authority to do so. In response to a member of Congress's 2015 request that DOJ exercise its "administrative authorit[y] to limit the availability of [Byrne] JAG . . . grants" based upon state and local assistance with federal immigration enforcement, DOJ stated that it did not have the "discretion to suspend funding" for "formula-based" grants like Byrne JAG, whose eligibility criteria were "set firmly by statute."[33] DOJ further expressed in that 2015 letter the agency's view that that denying law enforcement funding to jurisdictions for not certifying compliance with § 1373 would lead to

---

[33] *See Letter from Assistant Attorney General Peter J. Kadzik to Senator Richard Shelby* ("Kadzik Ltr.") at 1-2 (Sept. 10, 2015), ECF No. 58-9, at AR-00112 to AR-00113.

"significant, and unintended" impacts on local populations who benefit from the programs funded by Byrne JAG, and "could have the unintended effect of impeding" public safety altogether. *See* Kadzik Ltr. at 1-2.

DOJ's announcement of the new Byrne JAG requirements in 2017 made no mention of DOJ's past position that it lacked authority to impose such requirements, much less explained DOJ's basis for its new position. The district court thus properly found that DOJ's action in imposing the challenged conditions was arbitrary and capricious because DOJ did not explain its departure from past practice in imposing the challenged conditions in 2017, and altogether failed to consider "an important aspect of the problem," *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)—that is, "whether the perceived benefits of the [challenged] conditions outweighed" their potential negative effects (JA 34-35). Indeed, as the Seventh Circuit has observed, where "local and state governments have concluded that the safety of their communities is furthered by a relationship of trust with the undocumented persons and lawful immigrants residing therein"—a decision that they and not the federal government "are clearly in the best position" to make—"[s]uch trust, once destroyed by the mandated

53

cooperation and communication with the federal immigration authorities, would not easily be restored." *Chicago*, 888 F.3d at 291. Thus, "the impact on localities forced to comply with [the challenged conditions] could be devastating." *Id.*

## B. DOJ's Unlawful Actions Violates the Constitution's Separation of Powers.

Under basic separation-of-powers principles, an executive "agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Here, Congress created the Byrne JAG program as "the primary provider of federal criminal justice funding to state and local governments," which the States have used for a wide variety of law enforcement purposes authorized by statute. *See Chicago*, 888 F.3d at 278; 34 U.S.C. § 10152(a)(1)(A)-(H). And Congress appropriates Byrne JAG program funds, on an annual basis, to be disbursed by DOJ to the States in accordance with the mandatory statutory formula. *See* 34 U.S.C. § 10156(a), (c). Because "Congress has neither conditioned Byrne JAG funds on the three conditions [challenged] here nor delegated the authority to impose these conditions" to DOJ, the district court properly

54

concluded that DOJ's attempt to withhold funding that Congress has not tied to immigration enforcement violates the Constitution's separation of powers. (JA 30-31.) *See Chicago*, 888 F.3d at 277.

DOJ misplaces its reliance on the observation that not every action by an executive official "in excess of his statutory authority" necessarily violates the Constitution's separation of powers. *See* Br. at 37. This general principle does not assist DOJ because the DOJ actions challenged here went beyond a mere "error in grant administration." *See id.* In seeking to deny funds that Congress appropriated for disbursement to States and localities under a statutory formula, DOJ has impermissibly intruded on Congress's constitutionally-conferred "exclusive power to spend," and thus violated the structural limitations inherent in the Constitution. *See City and County of San Francisco v. Trump*, 897 F.3d at 1225, 1234 (9th Cir. 2018) (invaliding executive order directing that all federal grants be withheld from state and local jurisdictions that don't comply with § 1373 on separation-of-powers grounds).

# CONCLUSION

This Court should affirm the district court's rulings below.

Dated: New York, New York
April 17, 2019

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for State Appellees


By:  /s/ *Linda Fang*
LINDA FANG
Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
ERIC R. HAREN
  *Special Counsel to the Solicitor General*
LINDA FANG
  *Assistant Solicitor General*
    *of Counsel*

*Counsel listing continues on next page.*

28 Liberty Street
New York, NY 10005
(212) 416-8656

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
55 Elm Street
Hartford, CT 06106

GURBIR S. GREWAL
  *Attorney General*
  *State of New Jersey*
Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

MAURA HEALEY
  *Attorney General*
  *Commonwealth of*
  *Massachusetts*
One Ashburton Place
Boston, MA 02108

MARK R. HERRING
  *Attorney General*
  *Commonwealth of Virginia*
202 North Ninth Street
Richmond, VA 23219

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Will Sager, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 11,139 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7).

*/s/ Will Sager*

# Addendum

## TABLE OF CONTENTS

PAGE

Malcolm S. Mason, *Monitoring Grantee Performance, in Federal Grant Law* (Malcolm S. Mason ed., 1982) ...........................ADD1

Termination? Refusal to refund for third grant year? Disallowance of costs involved? Other?

It is a fair question why, in the not-so-hypothetical case I have put, the second grant was made. Grantee's behavior on the first grant made it clear that grantee was a high-risk grantee. Why make grants to high-risk grantees? Carelessness? Sometimes. But often there is a better reason.

The basic goal of a grant program is to accomplish results, primarily the stimulation of local initiative, local creativeness, local sensitivity, local enthusiasm for programs that could not be accomplished or could not be accomplished well if carried out by a federal bureaucracy directly or by a contractor selected by the competition of an entrepreneurial world.

If you want that kind of enthusiasm, you must be prepared to accept the fact that creators and inventors are often not prudent businessmen and prudent businessmen often are not creative. You must often accept the fact that grantees undertaking such programs (primarily in the private sector) are specially created, special purpose organizations lacking financial stability apart from the grant, lacking fiscal and administrative experience but making up for it, you hope, in idealism, concern, innovation, freshness. Under certain circumstances nepotism can be consistent with idealism and concern. Grants are thus often made knowingly to grantees who represent a high risk, but a risk that is believed to be worthwhile in view of the importance of what it is hoped they will accomplish.[20]

When grants are made to high-risk grantees, it is a responsibility of the grantor to apply appropriate restraints by special conditions, to provide special support and assistance where necessary and special monitoring where necessary.[21]

## C. *How?*

Is the monitoring technique adequately defined? This does not mean defined with absolute precision, but in a manner reasonably intelligible to a reasonable grantee and reasonable program official or auditor or consultant. Are the standards reasonably defined? Where they are measurable, are the acceptable limits specified? In connection with standards, measurable standards are the easiest to deal with although they are not always the best. There is therefore a tendency to resort to the measurable even when it is not the best guide. To the extent that standards are subjective, is there a reasonable approximation to a standard that a professional in the appropriate discipline can apply? Sometimes

---

20. *See,* Mason, *Administration and Dispute Resolution, supra* note 4.
21. *See* Mason, *Administration and Dispute Resolution, supra* note 4; OMB Circular A-110, Para. 9; HEW GRANTS ADMINISTRATION MANUAL, 1-05-40C and—50 (High-Risk grantees).