LOHIER, *Circuit Judge*, joined by HALL, *Circuit Judge*, concurring:

    Until today, every single circuit judge to have considered the questions presented by this appeal has resolved them the same way. That's twelve judges—including one former Supreme Court Justice—appointed by six different presidents, sitting in four separate circuits, representing a remarkable array of views and backgrounds, responsible for roughly forty percent of the United States population, who, when asked whether the Attorney General may impose the challenged conditions, have all said the same thing: No.

    Undeterred, the panel breaks course in an opinion as novel as it is misguided. As my colleagues explain in their dissent from the denial of rehearing in banc, and as Justice Souter and Judges Selya, Barron, Rendell, Ambro, Scirica, Rovner, Bauer, Manion, Wardlaw, Ikuta, and Bybee have collectively demonstrated, the panel opinion misreads statutory text, misconstrues constitutional doctrine, and mistakes the conclusion that it prefers for the one that the law requires.[1] The task of remedying these very serious errors will now fall to the Supreme Court. I vote against rehearing in banc so that it may do so sooner rather than later. Indeed, if there is a single panel

---

[1] Chief Judge Katzmann aptly describes the opinions of other sister Circuits. See Katzmann, C.J., Dissenting Op. at 2 n.1.

1

decision that the Supreme Court ought to review from this Circuit next Term, it is this one.[2]

Just last year, a number of my colleagues who vote now to deny rehearing in banc reminded us all that "[t]he legitimacy of Congress' power to legislate [via a federal grant program] . . . rests on whether the State voluntarily and knowingly accepts the terms of [that grant program]." N.Y. State Citizens' Coal. for Children v. Poole, 935 F.3d 56, 59 (2d Cir. 2019) (Livingston, J., dissenting from the denial of rehearing in banc) (quotation marks omitted). This limit on the Spending Clause power that they so enthusiastically embraced comes from Pennhurst State School & Hospital v. Halderman, 451 U.S. 1 (1981), in which the Supreme Court required Congress to "speak unambiguously in imposing conditions on federal grant money." New York v. U.S. Dep't of Justice, 951 F.3d 84, 109 (2d Cir. 2020) (emphasis added) (citing Pennhurst). After Pennhurst, the requirement for clarity from Congress in this context is basic and fundamental. And so here the Department urged, the panel concluded, and the principal concurrence in the denial of rehearing in banc now insists that 34 U.S.C. § 10153(a)(5)(D) unambiguously informs States that they must abide by the

---

[2] See Cabranes, J., Concurring Op. at 5 ("There can be little doubt that . . . the conflict among the Circuits will be resolved by our highest tribunal.").

certification condition.  See Brief for Defendants-Appellants at 26–30; New York, 951 F.3d at 110–11; Cabranes, J., Concurring Op. at 1–2.

The problem with this "thrice-asserted view," however, is that it "is wrong, wrong, and wrong again."  Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 80 (2013) (Kagan, J., dissenting).  To start, the panel itself acknowledges that Section 10153(a)(5)(D) "fails to specify precisely [by] which laws" States must abide.  New York, 951 F.3d at 110.  No surprise, then, that States, cities, and municipalities across the country—the very entities whose knowing acceptance is paramount—have agreed with the First Circuit that the panel's interpretation of Section 10153(a)(5)(D) is "extravagant."  Brief for Chicago et al. as Amici Curiae Supporting Plaintiffs-Appellees at 14 (quoting City of Providence v. Barr, 954 F.3d 23, 37 (1st Cir. 2020)).  Sheriffs, police chiefs, and district attorneys have likewise criticized the panel's interpretation as "striking."  Brief for Local Law Enforcement Leaders as Amici Curiae Supporting Plaintiffs-Appellees at 3.  And again, every judge to have considered the certification condition has determined that Section 10153(a)(5)(D) does not permit it.  But these federal judges, States, cities, municipalities, sheriffs, police chiefs, and district attorneys are not just

3

1    wrong, says the panel, they are unambiguously wrong: there is no room for

2    debate about what Section 10153(a)(5)(D) means.

3    How does the panel reach such a self-assured conclusion?  It first claims

4    that Section 10153(a)(5)(D) is unambiguous by observing that while it "fails to

5    specify precisely which laws are applicable, that uncertainty can pertain as much

6    for laws applicable to requested grants as for those applicable to grant

7    applicants."  New York, 951 F.3d at 110 (quotation marks omitted).  In other

8    words, multiple ambiguities translate into clarity, two "maybes" mean yes.  But

9    as several of my colleagues in this case and a chorus of others have explained,

10   there is one good reason after another to think that "applicable" in fact means

11   laws applicable to the grant itself, not to grant recipients broadly speaking.  See

12   Pooler, J., Dissenting Op. at 5–6; see also City of Chicago v. Barr, 961 F.3d 882,

13   898–909 (7th Cir. 2020); City of Providence, 954 F.3d at 36–39; City of

14   Philadelphia v. Attorney Gen., 916 F.3d 276, 288–91 (3d Cir. 2019).

15   The panel's second interpretive twist is more striking still.  Here, the panel

16   admits that Section 10153(a)(5)(D) may be ambiguous but contends that the

17   Attorney General's identification of 8 U.S.C. § 1373 as an "applicable Federal

18   law" under Section 10153(a)(5)(D) is a permissible "clarifying interpretation[]" of

4

1   it. New York, 951 F.3d at 110. To support that argument, the panel leans heavily

2   on Bennett v. Kentucky Department of Education, 470 U.S. 656 (1985). But

3   Bennett held that "ambiguities in the requirements [of a federal grant program]

4   should [not] invariably be resolved against the Federal Government as the

5   drafter of the grant agreement." Id. at 669. Thus while Bennett remarked that

6   Congress often "[can]not prospectively resolve every possible ambiguity" in a

7   federal grant program, see id., Bennett did not answer the relevant question

8   before us: whether this ambiguity in Section 10153(a)(5)(D) should give us pause

9   before embracing the Department's position.

10       Until the challenged conditions were announced in 2016, the Edward

11  Byrne Memorial Justice Assistance Grant Program (the Byrne JAG Program), 34

12  U.S.C. §§ 10151–10158, had never in its existence conditioned the availability of

13  its funds on the fidelity that localities displayed to federal immigration policies.

14  Nor did localities appear to use the Byrne JAG Program funds for immigration

15  purposes. See New York, 951 F.3d at 93. This is as it should be. After all, the

16  Byrne JAG Program, spurred by the murder of NYPD Officer Edward Byrne,

17  was designed to aid States and cities in fighting crime, not immigration. See, e.g.,

18  34 U.S.C. § 10152(a) (listing the criminal justice purposes toward which Byrne

JAG Program funds may be directed); Nathan James, Cong. Research Serv., RS22416, Edward Byrne Memorial Justice Assistance Grant Program: Legislative and Funding History 1–2 (2008) (explaining that the Byrne JAG Program reflected increased support for state and local law enforcement to respond to rising crime rates); see also Pooler, J., Dissenting Op. at 2 ("Immigration enforcement is not identified as an area for which grant funds may be used. The statute requires the DOJ to issue Byrne grants pursuant to a formula that distributes funds based on state and local populations and crime rates.").

The panel opinion, in less than two pages of text, ignores virtually all of this. Instead, it concludes that "[k]nowing acceptance is no concern here." New York, 951 F.3d at 110 (quotation marks omitted).[3] Again, several of my colleagues who vote here to deny rehearing in banc took a different position last year in Poole.[4] 935 F.3d at 59 (Livingston, J., dissenting from the denial of

---

[3] For substantially the reasons provided by my colleagues dissenting from the decision to deny rehearing in banc, I also agree that the panel decision incorrectly resolved the other statutory interpretation issues before it. See Pooler, J., Dissenting Op. at 3–11.

[4] Judge Sullivan misunderstands my point about Poole. In referring to the inconsistency of their opinions, I have not accused him or any of my colleagues of "bad faith or hypocrisy." Sullivan, J., Concurring Op. at 1. And the differences Judge Sullivan lists between Poole and this case relate only to policy and result. None deflects from the Supreme Court's central holding in Pennhurst that Congress must speak unambiguously as to the terms on which it provides funds to States and municipalities.

rehearing in banc) (emphasizing the importance of "whether the State voluntarily and knowingly accepts the terms of" a federal grant program); compare also New York, 951 F.3d at 109 (recognizing "Congress's duty to speak unambiguously in imposing conditions on federal grant money") with Cabranes, J., Concurring Op. at 2 ("[R]easonable judicial minds can differ as to whether the relevant statutory text permits the Department of Justice to impose the challenged conditions on grants of money to state and municipal law enforcement.").

Why has this decision careened so far off the textualist track? How can it be that the language of the statute is both unambiguous and at the same time that reasonable minds could differ about the meaning of the statutory text? Setting aside the policy result of cutting funds to local police forces that refuse to toe the Department line on immigration and that want to focus instead on combatting local crime, what the panel has done here is not an approach that is true to Congress's words or to ordinary principles of statutory construction.

This error creates an important circuit split that needs to be repaired definitively and now.[5]  Unfortunately, the split arises at the end of our Term.  Our already cumbersome process for proceeding in banc, slowed by a pandemic, is not likely to correct anything anytime soon.  And even if we rectified the panel's error, the Department, encouraged by the panel's decision, would continue to peddle its false and contorted theory to the remaining circuits that have yet to debunk it.  Under these circumstances, the better course, in my view, is for the Supreme Court to grant certiorari and reverse.  It can do so faster than we can, and it alone can forestall the spread of this grievous error.

For that reason, and that reason only, I concur in the denial of rehearing in banc.

---

[5] I agree with my colleagues who dissent from the denial of rehearing in banc that this case is of exceptional importance.  See Pooler, J., Dissenting Op. at 3; Katzmann, C.J., Dissenting Op. at 9.  The panel's decision, should it stand, has serious consequences that we should carefully consider.  For example, nothing in the decision stops the Department from conditioning Byrne grants on a State's allegiance to federal environmental laws.

8