ROSEMARY S. POOLER, *Circuit Judge,* joined by DENNY CHIN and SUSAN L. CARNEY, *Circuit Judges*, dissenting from the denial of rehearing en banc:

The panel opinion in this case allows the Executive to impose funding conditions on congressionally allocated federal funds in a manner plainly not contemplated by Congress. Astonishingly, given that four other circuits came out the other way, this Court refused to hear this case en banc. I respectfully dissent from the denial of rehearing en banc.

Appellees are states and a city that sought funding from the federal government through the Byrne Memorial Justice Assistance Grants program ("Byrne Grant Program"). The Byrne Grant Program evolved from a 1968 block grant program for law enforcement and criminal justice developed by Congress because "crime is essentially a local problem that must be dealt with by State and local governments." Omnibus Crime Control and Safe Streets Act of 1968 ("1968 Act"), Pub. L. No. 90-351, 82 Stat. 197, 197. In enacting the 1968 Act, Congress intended to "guard against any tendency towards federalization of local police and law enforcement agencies." *Ely v. Verde*, 451 F.2d 1130, 1136 (4th Cir. 1971) (discussing the legislative history of the 1968 Act). It did so by barring federal agencies and Executive Branch employees from using grants administered by the Department of Justice ("DOJ") to "exercise any direction, supervision, or control over any police force or any other law enforcement agency of any State or any political subdivision thereof." § 518(a), 82 Stat. at 208. Despite numerous modifications and amendments to the 1968 Act over the years, that provision remains in effect. *See* 34 U.S.C. § 10228(a).

In 2006, Congress reworked the 1968 Act to create and codify the Byrne Grant Program at issue here, with an eye toward providing state and local governments with "more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005); *see also* 34 U.S.C. §§ 10151-58. The statute allows grant

1

recipients discretion to use funds to support activities in any of eight broad criminal justice-related programs. 34 U.S.C. § 10152(a)(1). Immigration enforcement is not identified as an area for which grant funds may be used. The statute requires the DOJ to issue Byrne grants pursuant to a formula that distributes funds based on state and local populations and crime rates. *See* 34 U.S.C. § 10156; *see also City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (noting that "'formula' grants . . . are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula"). So long as they use their funds to satisfy the statute's goals and meet the statute's certification and attestation requirements, state and local governments are entitled to their share of the formula allocation. *See* 34 U.S.C. §§ 10152(a)(1), 10153(A).

In 2017, the DOJ adopted a policy requiring Byrne Grant Program applicants to:

1. Submit a Certification of Compliance with 8 U.S.C. § 1373, a federal law that bars cities or states from restricting communications by their employees with the Department of Homeland Security ("DHS") about the immigration or citizenship status of individuals (the "Certification Condition");

2. Implement a law, policy, or practice that provides DHS officials access to any detention facility to determine the immigration status of those held within (the "Access Condition"); and

3. Implement a law, policy, or practice that ensures correctional facilities will honor any formal written request from the DHS and authorized by the Immigration and Nationality Act seeking advanced notice of the scheduled date and time for a particular alien (the "Notice Condition").

Appellees challenged these conditions by bringing suit in the Southern District of New York. The lower court granted Appellees partial summary judgment, enjoining the DOJ from enforcing the conditions and ordering the release of the 2017 Byrne Grant Program funds. *See New York v. U.S. Dep't of Justice*, 343 F. Supp. 3d 213 (S.D.N.Y. 2018). Our Court reversed this grant of summary judgment, vacated the order to release the funds, and remanded the case. *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 124 (2d Cir. 2020).

At the time of the district court's decision, the Seventh Circuit had upheld an injunction precluding enforcement of the Notice and Access Conditions, *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018), *reh'g en banc granted in part on other grounds, vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *reh'g en banc vacated*, Nos. 17-2991, 18-2649, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). Since then, three more of our sister circuits have also upheld injunctions barring enforcement of all or some of the conditions. *See City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020); *City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019); *City of Philadelphia v. Attorney Gen.*, 916 F.3d 276 (3d Cir. 2019).

The circuit split—which generated a host of persuasive opinions from our sister circuits—calls into serious question the correctness of our Court's rationale and conclusions. The opinion in *New York v. U.S. Department of Justice* ignores the words of the statute, the relevant legislative history, and the conclusions of our sister circuits. I am, frankly, astounded that my colleagues did not find this a case of exceptional importance warranting en banc review. *See* Fed. R. App. P. 35(a)(2).

**I.      The DOJ's Statutory Authority to Impose the Challenged Conditions**

A.  The Certification Condition

The Certification Condition requires applicants submit a Certification of Compliance with 8 U.S.C. § 1373, which bars state and local governments from prohibiting or restricting their employees from providing federal officials with information about individuals' citizenship or immigration status. The panel in *New York* concluded that the DOJ was statutorily authorized to impose the Certification Condition based on a statutory provision requiring that a Byrne Grant Program applicant include in its application "[a] certification, made in a form acceptable to the

3

Attorney General," that "the applicant will comply with all provisions of this part *and all other applicable Federal laws*." 34 U.S.C.§ 10153(a)(5)(D) (emphasis added). Based on the dictionary definition of the word "applicable," the panel determined that an "applicable Federal law" is "one pertaining either to the State or locality seeking a Byrne grant or to the grant being sought." *New York*, 951 F.3d at 106.

That conclusion is in error for a number of reasons. First, the panel's reading of the term "applicable Federal laws" fails to comply with the well-settled principle that statutes should be read so as "to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks and citation omitted); *see also United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992) (noting the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect"); *United States v. Anderson*, 15 F.3d 278, 283 (2d Cir. 1994) ("[C]ourts will avoid statutory interpretations that render provisions superfluous." ). As the Third Circuit explained, an interpretation as expansive as the panel's creates a redundancy issue because if "applicable" is construed to mean laws pertaining to both grants *and* applicants, "all other applicable Federal laws" in effect means "all other Federal laws." *See City of Philadelphia*, 916 F.3d at 289 (internal quotation marks omitted).

The panel argues that its interpretation does not run afoul of the canon against surplusage because "applicable" in fact serves a limiting function; the panel's logic seems to be that the provision is limited because "an applicant must certify its willingness to comply with those laws—beyond those expressly stated in Chapter 34—that can reasonably be deemed 'applicable.'" *New York*, 951 F.3d at 104, 106-07. This is incorrect. As the First Circuit—which issued its opinion after ours—aptly observed:

4

> The Second Circuit's interpretation of the phrase "applicable Federal laws"—which encompasses all federal laws that apply to state and local governments in any capacity—flouts [the] principle [against surplusage] by effectively reading the term "applicable" out of the statute. For instance, a local government can hardly certify that it will comply with a law that does not apply to local governments in the first place. Congress obviously could have written this provision to require Byrne [Grant Program] applicants to certify compliance with "all other Federal laws," but it did not. In our view, the fact that Congress included the word "applicable" strongly implies that the provision must refer to a subset of all federal laws that apply to state and local governments.

*City of Providence*, 954 F.3d at 37.

In addition, while the text of Section 10153(A)(5)(D) does not define "applicable," the statutory context makes clear that "applicable" means applicable to the grant, not the applicant more broadly. *See*, *e.g.*, *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008) ("[T]he term 'applicable' must be examined in context."). The other conditions in Section 10153(A) apply to the grant, not to those who receive the grant. *See*, *e.g*., 34 U.S.C. § 10153(A)(1) (stating that funds cannot be used to replace state or local funds); *id*. § 10153(A)(2), (3) (mandating that grant projects must be submitted for appropriate review); *id*. § 10153(A)(4) (setting forth a reporting requirement on how the grant is administered); *id*. § 10153(A)(6) (requiring a plan for how grant funds will be used). To read Section 10153(A)(5)(D) as the only condition that applies to states and localities' conduct *beyond* that which is undertaken in their capacities as grant recipients makes little sense. *See Kucana v. Holder*, 558 U.S. 233, 246 (2010) (holding that statutory provisions must be read in context and relying on the other statutory provisions that a particular provision is "sandwiched" between to delineate its scope). There is no reason why Congress would insert a condition unrelated to grant funds into a list that otherwise includes conditions that are closely linked to grant administration. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the

5

fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."); *see also City of Providence*, 954 F.3d at 37-38 ("It strains credulity to think that Congress would bury among those certifications and assurances an authorization for the DOJ to condition grants on certification of compliance with federal laws that . . . lack any nexus to the Byrne [Grant] program.").

The panel's broad reading of "all other applicable Federal laws" allows the Attorney General to condition the receipt of funds on any number of statutes, such as Section 1373, which have nothing to do with federal grants, and in so doing require applicants to comply with any federal directive, regardless of that directive's relationship with the grant at issue. But as the First Circuit observed, there is ample reason to "doubt that Congress intended to give the DOJ so universal a trump card." *City of Providence*, 954 F.3d at 38. For instance, as the First Circuit notes, the "formulaic nature" of the Byrne Grant Program undermines the notion that "applicable" should be read so expansively. *Id.*

Additionally, Congress reinforced its desire to avoid generally using grant funds to advance policy goals by "stating expressly in other statutes that noncompliance with those statutes' requirements could trigger the withholding of a set percentage of a Byrne [Grant Program] grant." *Id.* at 39. For example, Congress provided that no more than 10 percent of funds may be withheld for failure to meet "death-in-custody" reporting requirements. 34 U.S.C. § 60105(c)(2); *see also id.* § 40914(b)(1) (providing for a withholding of 4 percent of funds for failure to meet background check requirements); *id.* § 20927(a) (providing for a 10 percent reduction for failure to meet sex offender registration requirements); *id.* § 30307(e)(2)(A) (providing for a 5 percent reduction for failure to comply with measures to eliminate prison rape). No more than 5 percent of Byrne Grant Program funds were allowed to be used for

6

discretionary grants, which could be granted only under limited circumstances. *Id.* § 10157(b). These provisions further demonstrate that Congress did not intend to condition funds on compliance with every law applicable to applicants. "If Congress had already given the Attorney General [the] sweeping authority to withhold all funds for any reason, it would have no need to delineate numerous, specific circumstances under which the Attorney General may withhold limited amounts of funds." *City of Philadelphia*, 916 F.3d at 286. And if Congress were so concerned about state and local authorities flouting federal immigration law, it well knew how to codify that concern and utterly failed to do so here.

Congress in fact considered, on multiple occasions, making compliance with Section 1373 a condition of receiving federal funds—but has never actually done so. *See City of Chicago*, 888 F.3d at 277-78 (collecting bills). The panel's decision notes that enactment of Section 1373 "was informed by Congress's concern that States and localities receiving federal grants were hampering the enforcement of federal immigration laws," *New York*, 951 F.3d at 108, but it hardly follows from this observation that Congress intended to express that policy by conditioning the receipt of Byrne grants on compliance with Section 1373. If that were the case, Congress could have followed through with any one of its attempts to accomplish that goal. This is not the Executive Branch clarifying an ambiguity in a manner that gives effect to congressional intent—this is the Executive Branch sidestepping Congress's refusal to condition grant funds on compliance with Section 1373.

Finally, such a move violates the rule that conditions imposed on the recipients of federal grants are to be "unambiguously" set out by Congress. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Congress is, of course, free to "attach conditions on the receipt of federal funds," and may use that power "to further broad policy objectives by

7

conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (internal quotation marks and citation omitted). But "if Congress desires to condition the States' receipt of federal funds, it must do so unambiguously . . ., enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (internal quotation marks, brackets, and citation omitted).

The panel in *New York v. U.S. Department of Justice* asserts that there is no "knowing acceptance" concern here because the DOJ provided advance notice that the 2017 Byrne Grant Program applications had to certify a willingness to comply with Section 1373. *New York*, 951 F.3d at 110 (internal quotation marks omitted). But the fact that the DOJ "unambiguously" sets out the grant requirements is of no moment, because the conditions are to be set by Congress. Absent Congress writing Section 10153(a)(5)(D) to specify that compliance with every statute and regulation applicable to states and localities acts as a grant condition, Section 10153(a)(5)(D) cannot be read so expansively. To do so would allow the DOJ to exert a tremendous amount of leverage over state and local police authorities and to interfere in an area reserved to the states by imposing new interpretations of federal immigration statutes. *See* U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant (JAG) Program FY 2018 Local Solicitation 36-37, 44-45 (2018) (interpreting 8 U.S.C. §§ 1226(a), 1226(c), 1231(a)(4), 1324(a), 1357(a), 1366(1), 1366(3), 1373).

It is true, as the panel points out, that the Supreme Court has recognized that in establishing federal grant programs, Congress cannot always "prospectively resolve every possible ambiguity concerning particular applications of [a program's] requirements." *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985). But reading Section 10153(a)(5)(D) so broadly

8

does not resolve an ambiguity in the statute—it instead reads into the statute a meaning that simply is not there. That is contrary to Congress's intent to create a formula-based program that distributes awards through a "carefully defined calculation" that takes into account just population and crime statistics. *City of Chicago*, 888 F.3d at 285; *see also* 34 U.S.C. § 10156(a)(1) ("[T]he Attorney General shall . . . allocate" funds based on the statutory formula). Allowing the Attorney General to set policy-related conditions "destabilize[s] the formula nature of the grant." *City of Philadelphia*, 916 F.3d at 290; *see also City of Providence*, 954 F.3d at 34 (stating that "it is nose-on-the-face plain that Congress intended [Byrne Grant Program] to operate as a formula grant program").

In sum, there are numerous reasons why the panel erred in holding that "applicable Federal laws" means all laws applicable to states or localities applying for Byrne grants, including Section 1373. Rather, as our sister circuits have concluded, it is apparent that "applicable Federal laws" "are federal laws that apply to state and local governments in their capacities as Byrne [Grant Program] grant recipients." *City of Providence*, 954 F.3d at 38-39. As such, there is no statutory provision authorizing the DOJ's imposition of the Certification Condition.

### B. The Notice and Access Conditions

The panel's rationale for upholding the Notice and Access Conditions is also problematic. The panel determined that these conditions are authorized by the coordination requirement contained in Section 10153(A)(5)(C), which requires grant recipients to certify "in a form acceptable to the Attorney General" that "there has been appropriate coordination with affected [federal] agencies," and the reporting requirement contained in Section 10153(a)(4), which requires the maintenance and reporting of "such data, records, and information

9

(programmatic and financial) as the Attorney General may reasonably require." *See New York*, 951 F.3d at 117-18, 121. The panel explained that the coordination requirement provided statutory authorization because "when a State seeks Byrne funding for programs that relate to the prosecution, incarceration, or release of persons, some of whom will be removable aliens, there must be coordination with the affected federal agency, the Department of Homeland Security [], before a formal application is filed . . . ." *Id.* at 119. Similarly, the panel concluded that the reporting requirement provided statutory authorization for the Notice Condition because the release of information pursuant to this condition is programmatic "at least for Byrne-funded programs that relate in any way to the criminal prosecution, incarceration, or release of persons." *Id.* at 117.

Again, this overly expansive reading of the statute cannot stand. As the Third Circuit thoroughly explained:

> The data-reporting requirement is expressly limited to "programmatic and financial" information—*i.e.*, information regarding the handling of federal funds and the programs to which those funds are directed. It does not cover Department priorities unrelated to the grant program. Furthermore, the coordination requirement asks for a certification that there "has been" appropriate coordination. . . . [W]e interpret [that] to require certification that there *was* appropriate coordination in connection with the grantee's application. This does not serve as a basis to impose an *ongoing* requirement to coordinate on matters unrelated to the use of grant funds.

*City of Philadelphia*, 916 F.3d at 285. It is thus clear from the statutory text that Congress provided authority for the DOJ to mandate only that grant recipients "maintain and report information about its grant and the programs that the grant funds." *City of Providence*, 954 F.3d at 35; *see also City of Los Angeles,* 941 F.3d at 944-45; *City of Philadelphia,* 916 F.3d at 285. In addition, the DOJ is authorized "only to require a certification that the applicant has coordinated

10

in the preparation of its application with agencies affected by the programs for which the applicant seeks funding." *City of Providence*, 954 F.3d at 35; *see also City of Los Angeles,* 941 F.3d at 945; *City of Philadelphia,* 916 F.3d at 285. Yet what the DOJ seeks to require under the Notice and Access Conditions extends far beyond what the reporting and coordination provisions envision.

Rather than properly cabining the DOJ's authority, however, the panel concluded that the DOJ could impose the Access and Notice Conditions for nearly all law enforcement purposes, regardless of whether those purposes relate in any way to the grant. But as discussed above, Congress set out eight programs for which Byrne Grant Program funds may be used, and none is enforcement of federal immigration law. *See* 34 U.S.C. § 10152(a)(1). The statute simply does not support the weight the panel places on it. By permitting the DOJ to stretch its authority beyond its statutory bounds, the *New York* panel invites the Executive Branch to compel states and localities to provide information to, and coordinate with the federal government on, all aspects of law enforcement activity.

For these reasons, the panel's interpretation of the various statutory provisions contained in the Byrne Grant Program statute, as well as its ultimate conclusion that these provisions grant the DOJ authority to impose the Certification, Access, and Notice Conditions, is deeply flawed, and a worthy subject for en banc review.

**II.     Whether Section 1373 Violates the Anti-commandeering Doctrine**

The panel's treatment of the Tenth Amendment challenge in this case also calls for en banc consideration. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Congress thus has only "the power to

11

regulate individuals, not States." *New York v. United States*, 505 U.S. 144, 166 (1992). This mandate is enforced via the anticommandeering doctrine, which provides that "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).

As the panel noted, this Court previously upheld Section 1373 as constitutional in *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999). There, we concluded that "federal measures that seek to impress state and local governments into the administration of federal programs" violate the Tenth Amendment, but "federal measures that prohibit states from compelling passive resistance to particular federal programs" do not. *Id.* at 35. But the Supreme Court's recent decision in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), calls the viability of *City of New York* into serious question.

In *Murphy*, the Supreme Court invalidated a provision of the federal Professional and Amateur Sports Protection Act ("PASPA"), which prohibited states from allowing sports betting. 138 S. Ct. 1461. In defending the federal law, the DOJ argued that the anti-commandeering doctrine only prohibited the federal government from "affirmatively command[ing]" what the states must do, rather than prohibiting states from enacting certain types of laws. *Id.* at 1478 (internal quotation marks omitted). Thus, the DOJ argued PASPA did not run afoul of the anti-commandeering doctrine because it did not prevent the complete legalization of sports gambling, just those state laws that authorized gambling with restrictions, such as limiting the location where such bets could be made. The Supreme Court rejected this argument:

> The PASPA provision at issue here—prohibiting state authorization of sports gambling—violates the anti-commandeering rule. That provision unequivocally dictates what a state legislature may and may not do. . . . It is as if federal officers were installed in

12

state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals. A more direct affront to state sovereignty is not easy to imagine.

Neither [the sports leagues] nor the United States contends that Congress can compel a State to enact legislation, but they say that prohibiting a State from enacting new laws is another matter. . . .

This distinction is empty. It was a matter of happenstance that the laws challenged in *New York* and *Printz* commanded "affirmative" action as opposed to imposing a prohibition. The basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event.

*Id.* at 1478.

Section 1373 provides in relevant part that:

(a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

8 U.S.C. § 1373.

Just as PASPA did, Section 1373 seeks to skirt the anti-commandeering doctrine's prohibition against coercing states into enforcing federal law. While PASPA sought to accomplish this goal by providing that states could not "sponsor, operate, advertise, promote, license, or authorize by law or compact" sports betting, 28 U.S.C. § 3702(1), Section 1373

13

attempts to do so by stripping from state governments the right to control state officials' communication of information collected for state purposes and at state expense. Just as PASPA barred states from taking certain action (that is, authorizing sports betting), Section 1373 bars states from taking certain action—that is, prohibiting certain communications to federal officials. Thus, our Circuit's previous reliance on the distinction between "measures that seek to impress state and local governments into the administration of federal programs" and "federal measures that prohibit states from compelling passive resistance to particular federal programs" in striking down a Tenth Amendment challenge to Section 1373, *City of New York*, 179 F.3d at 35, is no longer valid in light of *Murphy*. Even the *New York* panel does not seem to challenge this conclusion. 951 F.3d at 113 (noting that "*Murphy* may well have clarified that prohibitions as well as mandates can manifest impermissible commandeering").

Nonetheless, the panel held that the district court erred in concluding that Section 1373 violated the Tenth Amendment because the district court failed to identify a "reserved power States have to enact laws or policies seemingly foreclosed by 8 U.S.C. § 1373." *Id.* at 114. The panel relied heavily on the broad power of the federal government in the immigration context, suggesting that states accordingly lacked power in this arena. *Id.* at 113. But the relevant power reserved to the states in this situation is not the power to enact immigration-related legislation. Rather, the reserved power at issue is the authority of the states to refuse the aid of state officials in enforcing federal law. In failing to engage with this power, the panel erred in its analysis of whether Section 1373 would be facially unconstitutional. *See Printz*, 521 U.S. at 932 n.17, 935 (holding that a statute, which "requires [state employees] to provide information that belongs to the State and is available to them only in their official capacity," violates the Tenth Amendment);

*see also id.* at 928 (explaining that the purpose of anti-commandeering doctrine is the "[p]reservation of the States as independent and autonomous political entities").

The panel then went on to conclude that "§ 1373 does not violate the Tenth Amendment *as applied* here to a federal funding requirement." 951 F.3d at 114. It seems the panel concluded that the as-applied challenge fails because Congress has the ability to fix conditions, such as compliance with "applicable Federal laws" as was the case here, on receipt of federal funds. *Id.* at 114-15. But this conclusion makes little sense, in my view. If Section 1373 is a facial violation of the Tenth Amendment, and therefore unconstitutional, then it cannot fall within the scope of "applicable Federal laws," even if the Certification Condition stands. Thus, by relying on the validity of the condition here to suggest that Section 1373 is constitutional as applied, the panel engages in circular reasoning and evades the ultimate issue.

Every other court to have considered the issue post-*Murphy* reached the correct conclusion: Section 1373 violates the Tenth Amendment and is unconstitutional, even as applied to the situation at hand. *See City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 331 (E.D. Pa. 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 872 (N.D. Ill. 2018); *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 953 (N.D. Cal. 2018); *cf. United States v. California*, 314 F. Supp. 3d 1077, 1101 (E.D. Cal. 2018).

For the reasons given above and found in the opinions of our sister circuits, I respectfully dissent from the denial of rehearing en banc. Perhaps the Appellees will find the relief they seek at the Supreme Court.